**R. G. JOHNSON CO. v. MARCHIANDO.**

No. 10179.

United States Court of Appeals
Seventh Circuit.

Sept. 13, 1950.

Rehearing Denied Oct. 18, 1950.

G. William Horsley, Springfield, Ill., for appellant.

James B. Martin, Norman P. Jones, Springfield, Ill., for appellee.

Before KERNER, DUFFY and LINDLEY, Circuit Judges.

DUFFY, Circuit Judge.

This is an appeal from a preliminary injunction issued May 25, 1950, as well as from a temporary restraining order theretofore issued, whereby the defendants individually and the Progressive Mine Workers of America, District No. 1, its officers, agents, servants and employees, were enjoined and restrained in the particulars hereinafter set forth.

The plaintiff is a Delaware corporation. The individual defendants are residents of Illinois. Defendant Progressive Mine Workers of America, District No. 1 (hereinafter called "Progressive Mine Workers"), is an unincorporated labor union with principal offices in Springfield, Illinois. Freeman Coal Mining Corporation (hereinafter called "Freeman") is an Illinois corporation.

Freeman owned a coal mine site near Farmersville, Montgomery County, Illinois. On April 21, 1950, plaintiff entered into a written contract with Freeman to construct a main hoisting shaft and an auxiliary shaft on said premises. The contract provided that Freeman was to pay plaintiff $400,000 and that "contractor (plaintiff) shall furnish all labor and material (with the exception of the material to be supplied by Owner as provided in the specifications hereinbefore referred to)." [1] In Paragraph 2 it was provided, "Contractor shall furnish all equipment, tools and facilities which may be required * * *." The contract also provided: "10. Contractor has represented that his personnel are members of The United Mine Workers of America. Contractor shall at all times enforce strict discipline among his employees and shall not employ on the work any unfit person or anyone not skilled in the work assigned to

---

1. The record before us does not contain the specifications, and they likewise were not before the district court.

him or any person not acceptable to Owner."

At the time Freeman acquired the coal mine site in 1949 it was the operator of two large coal mines in southern Illinois, both mines being operated under labor agreements with the United Mine Workers of America (hereinafter called "United Mine Workers"). Early in 1950, representatives of the Progressive Mine Workers, in conference with top officials of Freeman at Chicago, represented that about 125 miners in Montgomery County belonging to their organization were at that time unemployed, and they urged employment of such miners. The Freeman officials informed them that they (Freeman) would have to do business with the United Mine Workers because they were afraid of trouble at their other Illinois mines if they did otherwise.

Charles Haberlen, an engineer, was in charge of the project for Freeman. He started his work at the mine site on December 1, 1949, where he thereafter conducted tests and made surveys. He, James Fox, a mining engineer, and the latter's assistant were the only employees at the mine site until April 30, 1950. Shortly before April 30 Haberlen determined that he needed the services of additional men, and asked Herman Lisse, board member of the United Mine Workers, to furnish a list of prospects. From the list furnished Haberlen selected ten men, all of whom were members of the United Mine Workers, and nine of whom were then employed in various mines located outside of Montgomery County, the tenth man being unemployed. The ten were notified to report for work at the mine site on May 1, which they did. The nine who had been employed gave up their jobs in order to accept employment at the Freeman Mine site. Those reporting expected to have permanent work in the digging of the shaft and in the mine after mining was started. Plaintiff planned to use about 70 men in digging the shaft, of which 20 would be skilled workmen which they intended to bring from Pennsylvania, and 50 workers were to be hired locally.

Although the contract itself is not in the record, it is conceded that on or about May 3, 1950, Freeman signed a contract with the United Mine Workers making that organization exclusive bargaining agent for its employees at its Montgomery County mine.

None of the plaintiff's employees were at the mine site prior to May 9, the date of the commencement of this action; hence none were interfered with in any way by defendants. However, three carloads of equipment had been shipped by plaintiff for use at the Freeman premises but had not arrived.

The Progressive Mine Workers organization regarded Montgomery County as their exclusive territory and desired to prevent, if possible, what they regarded as an invasion of their territory by United Mine Workers. Commencing April 24, 1950, the mine site was picketed by members of the Progressive Mine Workers, assisted by men belonging to several American Federation of Labor unions. No violence of any kind was experienced through May 3. On May 1, without molestation on the part of the pickets, a truckload of reinforcing steel, to be used in the mine shaft, was unloaded by the ten men who reported for work on that day.

On May 4 only six of the ten new employees reported for work. On that day Herman Lisse and six other officials or members of United Mine Workers arrived in an automobile and drove onto the premises. None of these men were employees of the plaintiff or Freeman. There was testimony that firearms were seen in the Lisse automobile. A large number of pickets had assembled. Haberlen and Lisse later started to leave the coal mining property to ascertain why the other four employees had not reported for work, and their car was stopped by pickets, some of whom threatened to take Lisse from the car. Some threats were made and profanity used, but no-one laid hands on Lisse. A short time later two trucks drove to the mine site loaded with steel which plaintiff intended to use to reinforce the concrete walls of the shaft. Although there is considerable testimony that the trucks were not unloaded because the truck drivers refused to cross the picket lines, there is some credible evidence which sustains the court's finding that

the pickets prevented the unloading of the steel at the mine site, and we must accept that version. The trucks were then driven to Kincaid, about twenty miles distant, where they were unloaded without molestation.

As the tension mounted on May 4, defendant Marchiando telephoned Haberlen at the mine site and told him that if the men then on the Freeman premises desired to leave he would guarantee their safe conduct through the picket line. Haberlen agreed and, as Lisse and the United Mine Workers officials drove away, a window in one of the cars was broken. Testimony from several witnesses was that the driver of the automobile attempted to run down a picket who was whirled about, breaking the window with his arm. However, in view of the trial court's findings we accept the view that it was broken by a stone thrown by a picket. Again pickets shouted threats and used profanity. Sheriff Whitlock of Montgomery County and at least one State police officer were present at or near the entrance to the mine site. Pickets also were stationed near the mine site from May 5 to May 9, but did not cause any acts of violence or disturbance during that period.

The complaint herein was filed on May 9. On the same day, without notice or hearing, the court granted a temporary restraining order enjoining the defendants in various respects. On May 15 the court overruled defendants' motion to vacate the temporary restraining order, and overruled defendants' motion to dismiss the complaint. On May 17 a hearing was had on plaintiff's motion for a temporary injunction. On May 25 such injunction was issued.

On the hearing witness Johnson, the manager for plaintiff, testified: " * * * we have agreed with the Coal Mining Corporation to hire the men who belong to the Union they are working with. * * * We agreed with the Coal Company we would hire United Mine Workers. * * * My instructions have been to follow out the regulations of the United Mine Workers in hiring the men."

He further testified:

"Q. And all of the employees there were to be United Mine Workers, were they not? A. No, not all of them.

"Q. All except your supervisory personnel, is that not right? A. That is right.

"Q. I say, as a condition of employment, before you could employ a man he had to present evidence to you that he was a member of the United Mine Workers, did he not? A. When you hire a man, that would make him a United Miner.

* * * * * *

"A. They will become United Mine Workers when they are hired on this job.

"Q. You mean they will have to join? A. Yes."

Referring to the ten men hired by Freeman, Johnson testified:

"Q. Were you to use those employees in your work? A. Yes.

"Q. That was agreed with Mr. Haberlen, was it, that you would use the employees he hired in your company? A. It was agreed by the officers of the two companies.

"Q. Yes. So that those ten employees were in a day or two or three to become your employees when you were ready to go to work? A. Yes, sir."

In spite of Johnson's clear and unequivocal testimony hereinbefore quoted, the following day plaintiff recalled Johnson and succeeded in having him retract a part of his previous testimony. On this second appearance he stated there was no understanding or agreement about the employment of the ten men hired by Freeman; but he could not explain his change of testimony from the day before.

At the conclusion of the hearing the trial judge said: " * * * It is unfortunate when men have to fight for a chance to work. I do not mean by physical combat but by other lawful means, and that is all this is. It is a contest between two conflicting forces, two conflicting labor organizations, for a chance and an opportunity to work."

The court further stated: " * * * They (plaintiffs) have been interfered with and there has been some little violence, not of any great moment, but sufficient to have

prevented a delivery, I think by wrongful acts, of steel to the mine property. * * *"

The injunction was couched in broad terms, and restrained and enjoined the defendants from interfering with, threatening or attempting to influence or coerce, by force or violence, employees of plaintiff to refrain from working for plaintiff on work under its contract with Freeman (Par. 1, 2); from influencing the employees of Freeman and of independent contractors to refrain from transporting and unloading material at the mine (Par. 3); from congregating in any place where employees of plaintiff, Freeman or independent contractors might from time to time be directed to work, for the purpose of intimidating or injuring said employees, or for the purpose of obstructing, or hindering, or disturbing them in the discharge of their duties (Par. 4); from procuring others to assemble in the vicinity where employees of plaintiff, Freeman or independent contractors were required to work on the project of sinking the mine shafts, or at or near the ways traveled by said employees to or from their respective employment, for the purpose of preventing plaintiff from performing its contract (Par. 5); from collecting at or patrolling or crowding approaches to places where employees of plaintiff, Freeman or independent contractors might be directed to work (Par. 6); from going on the mine site for the purpose of intimidating employees of plaintiff, Freeman or independent contractors (Par. 7); from laying violent hands on officers, agents or employees of plaintiff, Freeman or independent contractors (Par. 8); and from interfering with delivery of supplies to the mine site (Par. 9).

The complaint herein was drawn on the theory that a labor dispute is not involved and no attempt was made to comply with the requirements of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115. Plaintiff's counsel frankly admits that if a labor dispute within the meaning of the Norris-LaGuardia Act is involved, the plaintiff cannot prevail and that the injunction was improvidently issued.

Conceding the closeness of the question, the trial court concluded that a labor dispute had not occurred under the facts of this case, and ordered the injunction to issue. Plaintiff here seeks to sustain the conclusion of the nonexistence of a labor dispute by the following arguments: (1) lack of an employer-employee relationship between the plaintiff and the defendants; (2) lack of a controversy concerning representation of persons seeking to arrange terms or conditions of employment; (3) the defendant union does not claim to represent plaintiff's supervisory employees and the plaintiff had no other employees in Montgomery County, Illinois; (4) it was the obligation of Freeman to have the steel for the shafts at the mine site and plaintiff could not begin to work or start hiring employees until such steel had been delivered at the site.

Illinois statutes do not define the term "labor dispute." However, Sec. 13 of the Norris-LaGuardia Act, 29 U.S.C.A. § 113, contains definitions of the term, and included therein are: "(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; * * * or when the case involves any conflicting or competing interest in a 'labor dispute' (as defined in this section) of 'persons participating or interested' therein (as defined in this section)."

Subsection (b) characterizes a person or association as participating or interested in a labor dispute "if relief is sought against him or it, and if he or it * * * has a direct or indirect interest therein * * *." Subsection (c) provides: "(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

In New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 304 U.S. 542, 58 S.

Ct. 703, 82 L.Ed. 1012, the question was whether the matter in controversy involved or grew out of a labor dispute within the meaning of Sec. 13 of the Norris-LaGuardia Act. An association of negroes, organized for mutual improvement of its members, had requested a grocery company, in the course of personnel changes in certain stores patronized largely by colored people, to adopt a policy of employing negro clerks. When this request was ignored a picket line was established and the store sought an injunction. The court of appeals affirmed the action of the district court in granting the injunction as requested; however the Supreme Court held that the matter in controversy was a labor dispute within the meaning of the Norris-LaGuardia Act, even though the plaintiff was not a labor union.

In a dispute between a brewery workers' union and a teamsters' union as to which had the right to organize and claim as members the drivers of brewery wagons and trucks, the court said in Green v. Obergfell, et al., 72 App.D.C. 298, 121 F.2d 46, 50: "It would be difficult to imagine a case which more clearly involves a labor dispute within the meaning of the Norris-LaGuardia Act. * * *" And, further, 121 F.2d at page 51: "Nor is it material that no employer was joined as a party. The fact that, in cases previously arising under the Act, employers have appeared as parties, does not exhaust its possibilities or limit the broad scope and meaning which Congress intended to give to the Act. * * *"

In Fur Workers Union, Local No. 72 et al. v. Fur Workers Union, 70 App.D.C. 122, 105 F.2d 1, affirmed 308 U.S. 522, 60 S.Ct. 292, 84 L.Ed. 443, the plaintiff union was affiliated with the American Federation of Labor while the defendant union was affiliated with the C.I.O. The employer had entered into a written contract with one union and the other union commenced to picket the employer's place of business. The court found that a labor dispute existed.

In Blankenship v. Kurfman, 7 Cir., 96 F. 2d 450, 453, this court pointed out that the term "labor dispute" did not necessarily imply the relationship of employee and employer between the disputants, saying: "But the recent decisions of the Supreme Court of the United States * * *[2] clearly have established that there can be a labor dispute, within the meaning of the Norris-LaGuardia Act * * * in the absence of relation of employer and employee, and even when 'the petitioners are not engaged in any business competitive with that of the respondent, and the officers, members, or representatives of the Alliance (petitioners) are not engaged in the same business or occupation as the respondent or its employees.'"

The Progressive Mine Workers realized very well that an owner of a mine can in effect decide which union he will have representing his employees by his selection, according to union affiliation, of the first ten or other such small number of employees as would form the nucleus of a local union at his mine. Here, Freeman's manager took pains to obtain his list of prospects for the Montgomery County mine from the representative of the United Mine Workers, and he of course expected that if the nucleus of men forming the union were members of the United Mine Workers they would naturally vote to have that organization as exclusive bargaining agent at that mine.

As issued the injunction restrained defendants as to both Freeman's and plaintiff's employees practically to the same extent. Had Freeman been the party plaintiff it could not have asked that any greater restraint be placed upon the defendants as to Freeman than was done in the decree below. Were Freeman the plaintiff there is no question that a labor dispute existed under the provisions of the Norris-LaGuardia Act and under the court decisions heretofore cited. The fact that Johnson brought the action does not change the situation. There was a close working arrangement between Johnson and Freeman that, except for su-

2. Senn v. Tile Layers Protective Union, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229; Lauf v. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872; New Negro Alliance v. Sanitary Grocery Co., supra.

382

pervisory personnel, only United Mine Workers would be employed. The district court's findings that Johnson may employ such employees as it, in its sole judgment and discretion shall determine, is clearly erroneous. By its written contract Johnson agreed not to employ any person not acceptable to Freeman and it is apparent that except as to supervisory personnel only United Mine Workers would be acceptable.

We feel a labor dispute existed. The district court thus lacked jurisdiction to issue the temporary restraining order without notice or hearing, or to issue the temporary injunction without strict compliance with the Norris-LaGuardia Act. It follows the decree below must be vacated and·set aside.

Reversed.