NO. 5-96-0400

IN THE 

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_________________________________________________________________

MARION PRESLEY,                      )  Appeal from the 

                                     )  Circuit Court of

     Plaintiff and Counterdefendant, )  Williamson County.  

                                     )

v.                                   )  

                                     )  

P & S GRAIN CO., INC.,               )

                                     )

     Defendant and Counterplaintiff. )

-------------------------------------)

P & S GRAIN CO., INC.,               )

                                     )

     Third-Party Plaintiff-Appellee, )

                                     )

v.                                   )  No. 94-L-103

                                     )

MISSOURI FARMERS ASSOCIATION, INC.,  )

a Missouri Corporation,              )

                                     )

     Third-Party Defendant-Appellant.)

-------------------------------------)

MISSOURI FARMERS ASSOCIATION, INC.,  )

a Missouri Corporation,              )

                                     )

     Third-Party Plaintiff-Appellee, )

                                     )

v.                                   )

                                     )

KEN-MO AGRICULTURE CENTER, INC.,     )

a Missouri Corporation,              )  Honorable

                                     )  William H. Wilson, 

     Third-Party Defendant-Appellant.)  Judge, presiding.  

_________________________________________________________________

JUSTICE HOPKINS delivered the opinion of the court:  

Third-party defendant, Ken-Mo Agriculture Center, Inc. (Ken-Mo), appeals the judgment of the Williamson County circuit court ordering it to pay damages to third-party plaintiff, Missouri Farmers Association, Inc. (MFA), for indemnification of breach of warranty under the Uniform Commercial Code (810 ILCS 5/2-607(5) (West 1994)).  MFA, as third-party defendant, appeals the same judgment ordering it to pay damages to third-party plaintiff, P & S Grain Co., Inc. (P & S), pursuant to section 2-607(5) of the Uniform Commercial Code (810 ILCS 5/2-607(5) (West 1994)).  On appeal, Ken-Mo raises the following issues:  (1) whether the trial court had 
in personam
 jurisdiction over it under the long-arm statute and whether the exercise of such jurisdiction violated Ken Mo's due process rights under the Illinois and United States Constitutions; (2) whether the trial court had subject matter jurisdiction based upon the Seed Arbitration Act (710 ILCS 25/1 
et seq.
 (West 1994)); (3) whether MFA stated a proper cause of action against Ken-Mo in its third-party complaint; (4) whether the trial court erred in finding that a limitation-of-liability provision was not a term of the contract between Ken-Mo and MFA; and (5) whether the court erred in determining that the purchase price of the soybean seeds was an improper limitation of liability.  MFA, in its appeal, raises the following issues:  (1) whether the court had subject matter jurisdiction under the Seed Arbitration Act; and (2) whether the court erred in finding that a provision limiting liability to the purchase price of the soybean seeds was not a term of the contract between MFA and P & S.  For the reasons set forth below, we affirm in part and vacate in part.

FACTS

On or about June 23, 1992, plaintiff, Marion Presley, a farmer, contacted  R. L. Waldron at P & S, a corporation located in Marion, Illinois.  P & S is a business that distributes seed, fertilizer, and other agricultural products.  Waldron, P & S's president, testified that Presley wanted to purchase 360 bushels of Essex soybean seeds with a germination rate of at least 80%.  Waldron did not have the seeds needed by Presley, but Waldron called MFA, a corporation located in Columbia, Missouri, that same day and talked to Terry Spickert.  Waldron told Spickert that he needed 400 bushels of Essex soybean seeds, and Spickert stated that MFA would get the seeds for Waldron.  Waldron and Spickert discussed the purchase price; however, no other terms or conditions were discussed, and nothing was said about limiting liability to the purchase price of the seeds.  

Subsequently, Spickert sent Waldron a sales order form, which Waldron received after P & S received the soybean seeds.  Waldron did not look at the back of MFA's sales order form until the morning of trial.  Waldron admitted that paragraph five on the back of the order form stated as follows:  

"The [MFA] Seed Operations gives no warranty, express or implied, as to productiveness of any seeds its sells and will not be in any way responsible for the crop.  The liability, in all instances, is limited to the purchase price of seed."

Waldron also stated that P & S does approximately a million dollars worth of business per year with MFA, and that this is the first time he became aware of this paragraph limiting liability.  Waldron, who had been in the seed industry for 38 years, was unaware of any standard or trade usage limiting damages to the price of the seeds.  

Waldron became aware that the purchased seeds were from Ken-Mo when the soybeans were delivered to P & S on June 26, 1992.  The truck's delivery order indicated that the seeds came directly from Ken-Mo in Kennett, Missouri, to P & S in Marion, Illinois.  When the seeds were delivered to P & S on June 26, 1992, Presley's employees loaded 360 bags of seed directly from the delivery truck onto Presley's truck.  The remaining 40 bags were placed in P & S's warehouse.  

Waldron stated that, approximately a week or two after Presley planted the soybean seeds, Presley came to P & S and asked to see the label on the Essex soybean bags.  Presley did not believe he had good germination with the seeds.  Waldron showed Presley the label, which stated that the seeds would germinate at 80%.  Waldron did not contact anyone at that time about a possible problem with the seeds.  It was not until Waldron received a stop-sale order from the Illinois Department of Agriculture (the Department) on August 21, 1992, for the remaining 40 bags of Essex seeds that Waldron contacted Ken-Mo.  Waldron was unsure if he contacted MFA about the seed problem before or after he received the stop-sale order.  

Leon Billingsley, vice president of P & S, testified that approximately 10 to 14 days after Presley planted the seeds, he inspected Presley's field where the Essex seeds were planted.  In Billingsley's opinion, the seeds were planted appropriately, and there was ample moisture in the ground.  Billingsley estimated that only 20 to 25% of the Essex seeds had germinated.    

George Maksin, inspector for the Department, on July 21, 1992, did an unannounced inspection of P & S's seed warehouse, took samples of Ken-Mo's Essex soybean seed from P & S's warehouse, and submitted the seeds to the Department's testing laboratory in Springfield.  As a result of the Department's tests on the seed, a stop-sale order was issued to P & S on August 21, 1992.  A copy of the stop-sale order was sent to Ken-Mo.  

Nellie Tonelle, a seed analyst for the Department, testified that she analyzed the soybean seed brought in by Maksin.  She determined the germination rate of the Essex soybean seed to be 36%.  On a retest, which is required under the Department's rules, Tonelle found the germination rate to be 27%.  

 Spickert, manager of MFA's seed division, testified that he took Waldron's soybean seed order over the phone.  MFA did not have the seeds ordered by Waldron in stock, so he called Hubert Snipes at Ken-Mo, a seed producer in Missouri, and ordered the Essex soybean seeds from Ken-Mo.  Spickert stated that normally MFA would pick up the seeds from Ken-Mo and deliver the seeds to P & S, but MFA's trucks were unavailable at that time.  Spickert asked Snipes if Ken-Mo would deliver the seeds directly to P & S.  Snipes agreed and told Spickert that the cost to MFA for delivery would be $275.  Spickert testified that only the purchase price and the cost of delivery were discussed by Spickert and Snipes on the telephone.

On June 29, 1992, MFA received an invoice from Ken-Mo for the purchase of the seeds.  Attached to the invoice was the trucker's delivery order, showing that the seeds were delivered on June 26, 1992, to P & S in Marion, Illinois, by Ross Farms, the trucking company hired by Ken-Mo.   

Spickert testified that a seed tag indicates whether seed is certified, registered, or unregistered seed.  Spickert was aware of the limitation-of-liability language contained on seed tags in Missouri.  Spickert stated he ordered registered Essex soybean seeds from Ken-Mo.    

Snipes, manager of Ken-Mo, testified that the Essex soybean seeds involved herein were tested in February 1992, and that the germination rate at that time was 80%.  Snipes became aware of the problem with the soybean seeds when he received the stop-sale order from the Department.  Snipes stated that he was aware of the limitation-of-liability provision on seed tags and of the requirement of 30-day notice by registered mail when there is a problem with the seed.  Snipes confirmed that Spickert placed an order by phone, and that he received a purchase order for the seeds from MFA approximately three days later.  Snipes corroborated that Ken-Mo shipped the soybean seeds directly to P & S in Illinois, but Ken-Mo billed MFA for the soybean seeds and the cost of shipping the seeds.  

PROCEDURAL HISTORY

Because the Essex soybean seeds failed to germinate at the rate of 80% as stated upon the seed tags, Presley filed suit against P & S for breach of express and implied warranties.  In turn, P & S filed a counterclaim against Presley and a third-party complaint against MFA under the Uniform Commercial Code.  MFA in turn filed a third-party claim for indemnification against Ken-Mo. 

Ken-Mo was served in Missouri, after which Ken-Mo filed a special and limited appearance and a motion to quash service on MFA's third-party claim, asserting that the court did not have 
in personam
 jurisdiction either under the long-arm statute or under due process.  Ken-Mo filed an affidavit in support of its motion to quash service.  Following a hearing on Ken-Mo's motion to quash service, the court denied Ken-Mo's motion, finding that it had jurisdiction under sections 2-209(a)(7) and (c) of the Civil Practice Law (735 ILCS 5/2-209(a)(7), (c) (West 1994)).  The court also gave Ken-Mo approximately 25 days to file its answer to MFA's third-party claim.  Subsequently, Ken-Mo filed a request to certify the trial court's order dismissing its motion to quash service as a final and appealable order under Supreme Court Rule 308(a) (155 Ill. 2d R. 308(a)), so that Ken-Mo could file an appeal.  The trial court denied Ken-Mo's request for certification and ordered Ken-Mo to respond to the third-party complaint within 14 days.  Ken-Mo then filed an answer as ordered, and the case proceeded.  Following a bench trial, the court held that Presley was entitled to damages in the amount of $44,913.60 from P & S, that P & S was entitled to damages of $60,396.07 from Presley under its counterclaim, that P & S was entitled to damages in the amount of $44,913.60 from MFA on its third-party complaint, and that MFA was entitled to damages in the amount of $44,913.60 from Ken-Mo under its third-party claim against Ken-Mo for indemnification.  It is from this order that MFA and Ken-Mo appeal.  

ANALYSIS

Two issues have been raised regarding the jurisdiction of the trial court.  Because we deem the disposition of these issues crucial to the disposition of this appeal, we consider these issues first.  

1.  Lack of in personam jurisdiction.

Ken-Mo asserts that the trial court did not have 
in personam 
jurisdiction under either the long-arm statute or the due process requirements of the Illinois or the United States Constitutions.  Ken-Mo makes this assertion because the contract for the sale of the soybean seeds, which is the basis of the action in Illinois, was formed and executed in Missouri between two Missouri residents.  In its motion to quash and in the attached affidavit by Snipes, Ken-Mo established that Ken-Mo is a Missouri corporation formed under the laws of Missouri with its principal place of business in Kennett, Missouri.  Ken-Mo is not licensed to do business in Illinois and is not registered as a foreign corporation in Illinois.  Ken-Mo has not transacted any business in Illinois, it does not maintain a place of business in Illinois, and it has no officers, agents, or employees in Illinois. Ken-Mo does not advertise for or solicit any business in Illinois.  Ken-Mo shipped seeds to Illinois, but the delivery was requested and paid for by MFA.  MFA argues that the court had jurisdiction over Ken-Mo because Ken-Mo waived jurisdiction when Ken-Mo entered its general appearance or, alternatively, the court has jurisdiction under the long-arm statute.   

We disagree with MFA that Ken-Mo waived its jurisdictional argument when it entered its general appearance and filed its answer to the third-party complaint.  Initially, Ken-Mo filed a special and limited appearance for the sole purpose of contesting the court's jurisdiction over it.  The court denied Ken-Mo's motion to quash service and ordered Ken-Mo to answer the complaint by November 14, 1994.  Instead, Ken-Mo filed a request to certify the court's order denying Ken-Mo's motion to quash service as a final and appealable order so that Ken-Mo might appeal the court's decision.  We construe this action as another special and limited appearance by Ken-Mo to continue to contest the court's 
in personam
 jurisdiction, as Ken-Mo continued to argue that it was not amenable to process in Illinois.  The trial court denied Ken-Mo's motion to certify.  Only after Ken-Mo had utilized these arguments to contest the court's jurisdiction over it, and the trial court continued to direct Ken-Mo to answer the complaint, did Ken-Mo file a general appearance by filing a motion to dismiss MFA's third-party claim for indemnification.  Ken-Mo did not waive its objection to jurisdiction, since Ken-Mo did not participate in the Williamson County proceedings until the court had denied its motion to quash service and its request for certification.  These actions preserved Ken-Mo's jurisdictional objection.  See 
In re Marriage of Schuham
, 120 Ill. App. 3d 339 (1983).  

Further, section 2-301(c) of the Civil Practice Law provides in pertinent part as follows:

"(c) *** Error in ruling against the defendant on the objection [to jurisdiction] is waived by the defendant's taking part in further proceedings in the case, 
unless
 the objection is on the ground that the defendant is not amenable to process issued by a court of this State."  (Emphasis added.)  735 ILCS 5/2-301(c) (West 1994).  

Here, Ken-Mo did everything in its power to object to the court's jurisdiction, and each time its objection was denied by the court.  Ken-Mo made it clear that it was challenging the process issued by a court of this State.  Therefore, even though Ken-Mo participated in the trial below, it was only after it had no further recourse.  We find that the exception provided in section 2-301(c) applies to these facts, and Ken-Mo has not waived its objection to jurisdiction.  

Next, it must be determined whether Ken-Mo was subject to the court's jurisdiction under the long-arm statute (735 ILCS 5/2-209 (West 1994)).  The trial court determined it had 
in personam
 jurisdiction based upon sections 2-209(a)(7) and 2-209(c) of the Civil Practice Law.  These sections of the long-arm statute provide as follows:

"(a) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits *** to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any such acts:

* * *

(7) The making or performance of any contract or promise substantially connected with this State.  

* * *

(c) A court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States."

735 ILCS 5/2-209(a)(7), (c) (West 1994).

Under the foregoing statute, a court acquires 
in personam
 jurisdiction over a nonresident if certain acts happen.  

In the cases we have reviewed, it appears that section 2-209(a)(7) is generally linked and considered in conjunction with section 2-209(a)(1) (735 ILCS 5/2-209(a)(1) (West 1994)).  See 
E.A. Cox Co. v. Road Savers International Corp.
, 271 Ill. App. 3d 144 (1995); 
Swissland Packing Co. v. Cox
, 255 Ill. App. 3d 942 (1994).  In both 
E.A. Cox Co.
 and 
Swissland Packing Co.
, the nonresident defendants entered into contracts with Illinois residents, and both defendants negotiated contracts wherein the performance of the contracts involved delivery of goods, employees coming into Illinois to train Illinois personnel, and other contacts.  

The facts of the instant case are distinguishable from these two cases.  Of crucial importance to this court is that the defendants in the 
E.A. Cox Co.
 and 
Swissland Packing Co
. cases entered into contracts with Illinois residents.  Neither MFA nor Ken-Mo is an Illinois resident.  MFA does not argue that Ken-Mo transacted business in Illinois, but MFA only contends that the delivery of the seed was a sufficient connection with Illinois to bring Ken-Mo under Illinois's jurisdiction through use of the long-arm statute.  Ken-Mo argues that the contract, the purchase of soybean seeds, which is the basis of the cause of action here, was a Missouri contract entered into between two Missouri residents and, therefore, there was no making or performance of a contract substantially connected with Illinois.  We agree with Ken-Mo.  The only action between MFA and Ken-Mo that was connected to Illinois was the delivery of the seeds to P & S.  It was not the delivery of the seeds that formed the basis of this lawsuit.  Further, Ken-Mo delivered the seed to P & S only because MFA's trucks were unavailable.  MFA paid for the delivery.  This does not provide a contract with a substantial connection, either in formation or performance, to Illinois.  Thus, we find that Ken-Mo was not subject to section 2-209(a)(7) of the long-arm statute.  735 ILCS 5/2-209(a)(7) (West 1994).  

Additionally, we find that section 2-209(c) does not provide the trial court with 
in personam
 jurisdiction.  Section 2-209(c) of the long-arm statute has been held to be coextensive with due process.  
Pilipauskas v. Yakel
, 258 Ill. App. 3d 47 (1994).  Where the due process requirements of either the Illinois Constitution or the United States Constitution are not met, section 2-209(c) will not create 
in personam
 jurisdiction.  Ill. Const. 1970, art. I, section 2; U.S. Const., amend. XIV.  Here, we find that the court did not have jurisdiction over Ken-Mo based upon due process.  

The due process clause requires at least minimum contacts with the forum so that the maintenance of a suit and the rendering of a
 
judgment 
in personam
 
against a nonresident does not offend traditional notions of fair play and substantial justice.  
Pilipauskas
, 258 Ill. App. 3d 47; 
Financial Management Services, Inc. v. Sibilsky & Sibilsky, Inc.
, 130 Ill. App. 3d 826 (1985).  The minimum contacts must show that a defendant purposefully availed itself of the privilege of conducting activities in the forum State, thereby invoking the benefits and the protections of its laws.  
Financial Management Services, 
Inc.
, 130 Ill. App. 3d 826.  Factors to consider in determining minimal contacts are the nature of the business transaction, the applicability of Illinois law, the contemplation of the parties, who initiated the agreement, where the contract is formed, and where it is to be performed.  
Financial Management Services, Inc.
, 130 Ill. App. 3d 826.        

When these factors are considered in this case, it is evident that there are almost no minimal contacts by Ken-Mo with Illinois.  Therefore, the trial court had no 
in personam
 jurisdiction over Ken-Mo under the due process clause or under section 2-209(c) of the long-arm statute, and we reverse the trial court's ruling on this issue.  Since a judgment entered by a court without jurisdiction of the parties is void (
J.C. Penney Co., Inc. v. West
, 114 Ill. App. 3d 644 (1983)), the trial court's judgment against Ken-Mo is void, and we vacate that portion of the court's order awarding damages to MFA from Ken-Mo in the amount of $44,913.60.  Because of our ruling on this issue, we need not consider any of the remaining issues raised by Ken-Mo.

2.  Lack of subject matter jurisdiction.

Next, MFA contends that the trial court lacked subject matter jurisdiction under the Seed Arbitration Act (the Act) (710 ILCS 25/1 
et seq.
 (West 1994)), and that the court misconstrued section 10 of the Act (710 ILCS 25/10 (West 1994)) when it determined that the Act provides "an additional remedy and/or a limitation on civil suits."  P & S argues that if the Act is not construed as the court determined, then the Act is unconstitutional.  This issue appears to be a case of first impression.  

MFA argues that section 10 of the Act requires a purchaser of seed to first seek arbitration under the Act before a civil lawsuit may be filed, that arbitration is a precondition for filing its lawsuit, and that the trial court did not have subject matter jurisdiction because the Act requires arbitration before bringing suit, which P & S did not do.  Section 10 of the Act provides as follows:

"(a) A purchaser of seed cannot maintain a civil action against the seller for failure of the seed to produce or perform (i) as represented by a label attached to the seed or furnished under the Illinois Seed Law, *** unless the buyer has first submitted the claim to arbitration."  710 ILCS 25/10 (West 1994).

MFA argues that the word "cannot" in the statute mandates arbitration by the purchaser of seed before a civil action can be brought.  We disagree.

Our analysis involves the statutory construction of section 10 of the Act.  In construing a statute, the primary rule is to ascertain and give effect to the true intent of the legislature, and to do so, the first consideration is the statutory language itself.  
In re Estate of Wallis
, 276 Ill. App. 3d 1053 (1995).  If the language is clear, no resort to other aids of construction is necessary.  
Estate of Wallis
, 276 Ill. App. 3d 1053.  If the statute is susceptible of more than one interpretation, the court may look to other aids, such as the purpose to be served by the statute.  
D.C. v. S.A.
, 283 Ill. App. 3d 693 (1996), 
appeal allowed
, 169 Ill. 2d 565, 675 N.E.2d 632 (1996).  Courts should avoid construing a statute in a manner that raises substantial questions concerning the statute's constitutional validity.  
 Turner v. Campagna
, 281 Ill. App. 3d 1090 (1996).  Additionally, courts should construe a statute so as to avoid an absurd result or hardship.  
Szpila v. Burke
, 279 Ill. App. 3d 964 (1996).    

Here, we find the trial court's interpretation of section 10 of the Act to be correct, for otherwise an absurd result is produced or the Act is unconstitutional, neither result being favored under statutory construction principles.  We find that the word "cannot" used in section 10 is directory rather than mandatory.  Just as the word "shall" in a statute must be considered in context to determine if the provision is mandatory or directory (see 
Estate of Wallis
, 276 Ill. App. 3d 1053), so, too, must the word "cannot" in this case.  Where a statute provides that certain acts are to be done in a particular time and a particular manner and does not declare their performance to be essential to the validity of a proceeding, then the statute is directory.  
Estate of Wallis
, 276 Ill. App. 3d 1053.  If a statute requires certain acts to be done and if the statute also provides a result following the failure to do those acts, then the statute is mandatory; otherwise, if the statute provides no result for the failure to do the acts, the statute is directory.  
In re Special Education Placement of Walker
, 107 Ill. App. 3d 1053 (1982).  Here, the Act does not declare that the failure to arbitrate a dispute over a seed label will invalidate a court proceeding, nor does the Act state what results will follow if a party fails to arbitrate.  The most the Act provides is that the arbitration findings will be nonbinding on the parties, which provides no recourse (710 ILCS 25/70 (West 1994)), and that the refusal to participate in an arbitration will not constitute a defense in a court proceeding (710 ILCS 25/60 (West 1994)).  Thus, we find that the word "cannot" is directory and not mandatory, and the failure to arbitrate under the Act does not divest the court of subject matter jurisdiction. 

Further, although not a principle of statutory construction, we find that the placement of the Act in the compiled statutes reinforces our decision.  The Act appears in chapter 710 entitled "Alternative Dispute Resolution."  The word "alternative" is defined in the dictionary as "offering a choice of two or more things."  Webster's Third New International Dictionary 63 (1993).  By this definition, the placement of the Act implies that arbitration is a choice, not a requirement.  For the foregoing reasons, we find that the trial court ruled correctly in finding that it had subject matter jurisdiction and that the Act provides merely an additional remedy, or an alternative dispute resolution procedure. 

3.  Limitation of liability.

The last issue to be considered is whether the court's refusal to construe the limitation-of-liability provision in MFA's sales order form as a term of the contract between P & S and MFA is against the manifest weight of the evidence.  See 
Emmenegger Construction Co. v. King
, 103 Ill. App. 3d 423 (1982).  MFA argues that the sales order form was the only writing evidencing the terms of the contract with P & S, that the Uniform Commercial Code allows for an agreed limitation of liability in a contract (810 ILCS 5/2-719(a) (West 1992)), and that the limitation-of-liability provision here must be upheld.  

We agree with MFA that the Uniform Commercial Code allows for a limitation of liability; however, the court herein did not rule that a limitation of liability cannot apply--it ruled that the limitation-of-liability provision was not a term of the contract entered into by P & S and MFA.  Thus, our review is governed by contract principles.  

The essential elements needed for a valid contract are competent parties, valid subject matter, legal consideration, mutuality of obligation, and mutuality of agreement.  
Harris v. Johnson
, 218 Ill. App. 3d 588 (1991).  The mutuality of an agreement is the mutual assent by the parties to its terms, and the failure of the parties to agree or to discuss an essential term of a contract may indicate that the required mutual assent is lacking.  
Delcon Group, Inc. v. Northern Trust Corp.
, 187 Ill. App. 3d 635 (1989).  Here, we find that the mutuality of agreement to limit liability to the purchase price of the seeds was not present.  

Both Waldron and Spickert testified that the parties only discussed on the phone the amount of seed needed and the purchase price.  Following their phone conversation, MFA executed the oral contract by finding and having the seeds sent to P & S.  P & S received the sales order form around the same time as or after the seeds were received.  According to Waldron, P & S ordered approximately a million dollars worth of products from MFA a year, and Waldron was unaware of a policy or of a contract provision which would limit MFA's liability to the purchase price of the seeds.  Clearly, P & S never agreed to a term wherein MFA would be liable only for this amount.  It appears that the only purpose of the sales order form was to confirm the amount of seed ordered and the agreed price for the seed.  These matters were initially an oral agreement made at the time of the placement of the original order.  The trial court's finding that the limitation of liability provision was not a term of the contract was not against the manifest weight of the evidence.      

CONCLUSION

For the foregoing reasons, the judgment of the Williamson County circuit court is affirmed in part and vacated in part.  

Affirmed in part; vacated in part.  

MAAG, J., and RARICK, J., concur.