FIFTH DIVISION
January 25, 2008

No. 1-06-2374

| | | |
|---|---|---|
| TILLIE MORRIS and JOE MORRIS, | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | Appeal from the |
| | ) | Circuit Court of |
| v. | ) | Cook County |
| | ) | |
| HALSEY ENTERPRISES COMPANY, LTD., a | ) | |
| Taiwanese Corporation, | ) | |
| | ) | Honorable |
| Defendant-Appellant | ) | Jeffrey Lawrence, |
| | ) | Judge Presiding. |
| (Hunter Fan Company, an Illinois Corporation, d/b/a | ) | |
| Casablanca Fan Company, | ) | |
| | ) | |
| Defendant). | ) | |

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Plaintiffs Tillie and Joe Morris filed a lawsuit to recover damages allegedly caused by a

defective ceiling fan designed and manufactured by defendants Hunter Fan Company, an Illinois

corporation, d/b/a Casablanca Fan Company (Casablanca), and Halsey Enterprises Company,

Ltd., a Taiwanese corporation (Halsey). In response, Halsey filed a motion to quash service and

dismiss for lack of personal jurisdiction. The trial court denied the motion, and Halsey filed a

petition for leave to appeal pursuant to Supreme Court Rule 306(a)(3). 210 Ill. 2d R. 306(a)(3).

This court initially denied Halsey's petition, but the supreme court subsequently entered a

supervisory order directing this court to vacate our decision and grant Halsey leave to appeal.

1-06-2374

Morris v. Hunter Fan Co., 222 Ill. 2d 609 (2007). Having now granted Halsey's petition and reviewed its contentions on the merits, we reverse the trial court's denial of the motion to quash and dismiss.

BACKGROUND

Our factual summary is based on the record Halsey submitted to this court in support of its petition, as no additional portions of the trial court record were prepared after leave to appeal was granted. See 210 Ill. 2d R. 306(h).

On August 9, 2004, plaintiffs filed a first amended complaint against Casablanca and Halsey. In the complaint, plaintiffs alleged that Casablanca and Halsey designed and manufactured a "Star/Starlet Casablanca" ceiling fan which was then sold to customers in, among other places, Illinois. In September or October of 1997, plaintiffs purchased one of these ceiling fans and Joe Morris subsequently installed the fan in plaintiffs' home bathroom. On April 29, 2003, Tillie Morris suffered serious injuries after the fan motor fell on her without warning, causing her to fall to the floor and strike her head and face.

On May 5, 2005, Halsey filed a motion to quash service and dismiss the six counts in plaintiffs' complaint directed toward it on the grounds that the court lacked personal jurisdiction. In the motion, Halsey contended that its contacts with Illinois were so lacking that the exercise of personal jurisdiction over it would fail to satisfy the requirements of due process. In support, Halsey's motion contended that it: (1) was a Taiwanese corporation with a principal place of business in Taiwan, (2) had never manufactured or sold ceiling fans in Illinois, (3) at one time manufactured ceiling fans in Taiwan for Casablanca, but shipped those fans to California and

made only 10% of its gross profits from the production of those fans, (4) did not ship any ceiling fans to Illinois for Casablanca and did not know that Casablanca would market or sell ceiling fans in Illinois, (5) had no control over Casablanca's sale or marketing of ceiling fans and had not manufactured any fans for Casablanca since 1998, (6) has no sales or other offices, marketing personnel, bank accounts, telephone listings, real estate, or personal property in Illinois, (7) does not pay taxes in Illinois, is not a registered foreign corporation in Illinois, and has never before sued or been sued in Illinois, and (8) does not maintain an Internet website directed toward consumers in Illinois. Attached to the motion was an affidavit attesting to the truth of these assertions executed by Halsey's general manager, Benjamin Lee.

The trial court allowed the parties to engage in limited discovery on the issue of personal jurisdiction. In its answers to written discovery, Halsey stated that it produced approximately 386,000 units of 20 different types of ceiling fans for Casablanca between 1996 and 1998. Of these, approximately 5,228 units were of the Starlet model. Halsey acknowledged that around 1994, Casablanca informed it that a significant increase in production would be required because Casablanca would begin selling ceiling fans through Home Depot. Halsey denied it ever discussed any marketing or distribution aspects of Casablanca's arrangement with Home Depot.

In May 2005, the parties took a number of depositions. John Pearson, Casablanca's vice-president of marketing, testified that he had worked for Casablanca in various capacities for over 20 years. In 1994, Casablanca acquired the Homestead Ceiling Fan Company and continued to sell the Star and Starlet models that Homestead had previously sold and Halsey manufactured. In 1995, Casablanca was in turn bought by the Hunter Fan Company.

Pearson testified that Casablanca sold ceiling fans through a nationwide network of some 600 to700 retail lighting stores. Casablanca has also sold fans from time to time through nationwide home improvement stores such as Home Depot and Lowe's. Halsey was a Taiwanese manufacturer whose main business was producing ceiling fans for the United States market. Casablanca's business relationship with Halsey began in approximately 1990 or 1991 and continued through 1997 or 1998. During the relationship, Halsey would manufacture ceiling fans for Casablanca and package them for retail sale.

In the beginning, Halsey was producing approximately 20,000 to 30,000 units per year for Casablanca. However, Pearson began discussing an opportunity with Halsey to significantly increase this amount in order to supply ceiling fans nationwide to Home Depot in 1992 or 1993. This opportunity would require production to increase to 250,000 to 300,000 units per year. After ensuring that Halsey could meet this increased demand, Casablanca supplied Home Depot with ceiling fans from approximately 1993 to 1995. The Star and Starlet models were not sold through Home Depot, and Pearson could not recall ever discussing those models with Halsey.

Pearson testified Halsey was aware that Home Depot had stores nationwide and that Casablanca also distributed its fans through its nationwide chain of other retailers. He also testified that in addition to shipping fans to Casablanca in California, Halsey would also ship fans both directly to Home Depot's own regional distribution centers and to at least one other Casablanca customer. However, Pearson could not say that Halsey was aware its fans were distributed to any specific market, including Illinois. Moreover, Pearson himself was not sure if either Home Depot or Casablanca's other customers were located in each of the 50 states.

1-06-2374

Finally, Pearson testified that while he frequently met with Halsey representatives in Taiwan, California, and at a semiannual Dallas national show, he could only recall "running into them" once at a national trade show he attended in Chicago.

Lee Ching Tan, Halsey's chairman, testified that his company was an "original equipment manufacturer" that produced ceiling fans for a number of different companies. Approximately 70% of the fans it produced were exported to the United States, where it shipped hundreds of thousands of units each year. Halsey first began producing ceiling fans for Casablanca around 1992. Those fans would be shipped fully assembled and individually packaged. Tan knew that Casablanca was a "sizable" manufacturer and distributer of ceiling fans, but denied that he or anyone else at Halsey had any specific knowledge of Casablanca's distribution network or the identity of its customers.

The one exception was a specific instance where Casablanca asked Halsey to increase its production of ceiling fans for sale at Home Depot, which he understood to be a large national retail home improvement store. Tan asserted that Halsey never produced fans for any company located in Illinois, although he had attended a national trade show in Chicago seven or eight times. Halsey did not formally participate in the trade show, and Tan never saw any fans produced by Halsey on display there. While he did see clients at the show, he never conducted any business there. Tan did recall conducting business meetings with clients in California, Texas, Florida, and New York.

Donny Teng, Halsey's deputy general manager, confirmed that his company produced ceiling fans for other companies. Teng estimated that 80% to 85% of Halsey's production was

ultimately distributed in the United States and that the company shipped 700,000 to 800,000 units there annually. He was aware that ceiling fans manufactured by Halsey were sold in retail and specialized lighting stores in the United States, but he did not know where they were all located. Additionally, Halsey produced fans sold at Home Depot and Lowe's. He described Home Depot as a large household appliances store, but he did not know exactly where Home Depot's stores were located. Teng described Lowe's as a big household items store with retail stores in many states, but he did not know if it had any stores in Illinois.

Teng also testified that Halsey began producing fans for Casablanca in 1992 or 1993 and stopped in 1998. Over that time, Halsey produced some 10 to 20 different models for Casablanca, including the Star and Starlet models. Each fan was individually packaged, and Casablanca ordered 300,000 units from 1992 to 1996 and another 368,000 units from 1996 to 1998. Teng recalled that at one point Casablanca did request a significant increase in fan production for Home Depot, but he denied that he was otherwise aware of how Casablanca distributed its fans for sale. Teng had attended a national trade show in Chicago approximately seven times, but Halsey did not formally participate and he never saw any fans manufactured by Halsey on display there.

On July 28, 2006, the trial court entered a written order denying Halsey's motion to quash and dismiss, finding that "the exercise of in personam jurisdiction over Halsey is consistent with the Due Process clause." Halsey sought leave to appeal to this court, and following the supreme court's supervisory order, we granted Halsey's appeal on April 12, 2007.

ANALYSIS

On appeal, Halsey continues to assert that the assertion of personal jurisdiction over it would not comport with due process. We agree.

It is the plaintiffs' burden to demonstrate a prima facie basis for personal jurisdiction over a nonresident defendant such as Halsey. Commerce Trust Co. v. Air 1st Aviation Cos., 366 Ill. App. 3d 135, 140 (2006). A defendant's uncontradicted evidence may overcome a prima facie case and defeat jurisdiction. Kostal v. Pinkus Dermatopathology Laboratory, P.C., 357 Ill. App. 3d 381, 383 (2005). Where, as here, the trial court decides the issue of personal jurisdiction without an evidentiary hearing, our review is de novo. Commerce Trust, 366 Ill. App. 3d at 140.

Section 2-209(c) of Code of Civil Procedure contains a "catch-all" provision providing that an Illinois court may "exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c) (West 2004). "Thus, if the contacts between a defendant and Illinois are sufficient to satisfy both federal and state due process concerns, the requirements of Illinois' long-arm statute have been met, and no other inquiry is necessary." Kostal, 357 Ill. App. 3d at 387.

In a federal due process analysis, personal jurisdiction may be established where: (1) the nonresident defendant has sufficient "minimum contacts" with the forum state, (2) the cause of action arises out of or is related to those contacts, and (3) it is reasonable to require the nonresident defendant to litigate in the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-78, 85 L. Ed. 2d 528, 540-44, 105 S. Ct. 2174, 2181-85 (1985). Thus, we must first address whether Halsey had sufficient minimum contacts with Illinois.

1-06-2374

The United States Supreme Court has long held that the nonresident defendant's "minimum contacts" with the forum state must be sufficient enough that maintenance of a suit there does not offend " 'traditional notions of fair play and substantial justice.' " International Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158 (1945), quoting Milliken v. Meyer, 311 U.S. 457, 463, 85 L. Ed. 278, 283, 61 S. Ct. 339, 343 (1940). A nonresident defendant must have " 'fair warning' " that its activities may subject it to suit in the forum state. Burger King, 471 U.S. at 472, 85 L. Ed. 2d at 540-41, 105 S. Ct. at 2182. This "fair warning" requirement can be satisfied where the defendant purposefully directs its activities at residents of the forum state and the litigation results from alleged injuries that arise out of or relate to those activities. Burger King, 471 U.S. at 472, 85 L. Ed. 2d at 540-41, 105 S. Ct. at 2182. In such a situation, "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 501, 100 S. Ct. 559, 567 (1980).

The focus must be on the defendant's conduct, however. As the Supreme Court has observed:

> "The unilateral activity of those who claim some relationship with
> a nonresident defendant cannot satisfy the requirement of contact
> with the forum State. The application of that rule will vary with
> the quality and nature of the defendant's activity, but it is essential
> in each case that there be some act by which the defendant
> purposefully avails itself of the privilege of conducting activities

8

1-06-2374

> within the forum State, thus invoking the benefits and protections
>
> of its laws." Burger King, 471 U.S. at 474-75, 85 L. Ed. 2d at 542,
>
> 105 S. Ct. at 2185, quoting Hanson v. Denckla, 357 U.S. 235, 253,
>
> 2 L. Ed. 2d 1283, 1298, 78 S. Ct. 1228, 1239-40 (1958).

The requirement of "purposeful availment"ensures that a defendant will not be haled into [the forum state] solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts [citations], or of the 'unilateral activity of another party or a third person' [citation].' " Burger King, 471 U.S. at 475, 85 L. Ed. 2d at 542, 105 S. Ct. at 2183.

Plaintiffs claim specific personal jurisdiction over Halsey under a "stream of commerce" theory. The Supreme Court addressed the stream of commerce theory in World-Wide Volkswagen, 444 U.S. 286, 62 L. Ed. 2d 490, 100 S. Ct. 559. In that case, an automobile purchased in New York by New York residents was involved in an accident in Oklahoma and a products-liability action was filed against a number of defendants in that state. The Supreme Court ultimately found that the state court had no personal jurisdiction over the retail dealership that sold the automobile in New York or a related regional distributor when neither entity had any other connection to the state. The Court held that the single, unilateral action of the purchaser in bringing the automobile to Oklahoma could not establish sufficient minimum contacts necessary for personal jurisdiction over these two defendants. World-Wide Volkswagen, 444 U.S. at 298, 62 L. Ed. 2d at 502, 100 S. Ct. at 567. Nevertheless, the Court also stated:

> "[I]f the sale of a product of a manufacturer or distributor *** is

9

not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." World-Wide Volkswagen, 444 U.S. at 297-98, 62 L. Ed. 2d at 501-02, 100 S. Ct. at 567.

The Supreme Court addressed the stream of commerce theory again in Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987). In that case, a Japanese manufacture was aware that its products were being sold in California, but took no other action specifically directed toward that state. The Court unanimously agreed that California could not exercise personal jurisdiction over the foreign manufacturer in that case because it would be unreasonable. Asahi, 480 U.S. at 116, 94 L. Ed. 2d at 107, 107 S. Ct. at 1034. However, the Court split on the proper scope of the stream of commerce theory and whether sufficient minimum contacts between the manufacturer and California had been established. Four justices found that the "placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State.

Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State ***. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." Asahi, 480 U.S. at 112, 94 L. Ed. 2d at 104, 107 S. Ct. at 1032 (O'Connor, J., joined by Rehnquist, C.J., and Powell and Scalia, JJ.).

However, another four justices found that sufficient minimum contacts had been established under the stream of commerce theory. They held that personal jurisdiction over the Japanese manufacturer was consistent with due process as long as the defendant is involved in "the regular and anticipated flow of products from manufacture to distribution to retail sale" and it was "aware that the final product is being marketed in the forum State." Asahi, 480 U.S. at 117, 94 L. Ed. 2d at 107, 107 S. Ct. at 1034 (Brennan, J., joined by White, Marshall, and Blackmun, JJ.). This was so whether or not the defendant directly conducted any business in the forum state, or engaged in any additional conduct directed toward that state. Asahi, 480 U.S. at 117, 94 L. Ed. 2d at 107, 107 S. Ct. at 1035 (Brennan, J., joined by White, Marshal, and Blackmun, JJ.).

Unsurprisingly, courts have found it somewhat difficult to apply the stream of commerce theory in light of the Asahi decision. Indeed, our supreme court has described Asahi as an "extremely balkanized opinion" and recognized that "it is not possible to determine from Asahi whether the broad or the narrow version of the stream of commerce theory is correct." Wiles v. Morita Iron Works Co., 125 Ill. 2d 144, 156, 159-60 (1988).

11

1-06-2374

In Wiles, a Japanese manufacturer challenged personal jurisdiction in an Illinois lawsuit filed after two of four machines it sold in Japan were shipped by the purchaser to Illinois. The manufacturer had no other contacts with Illinois and there was no evidence it was aware that the purchaser intended to ship the two machines to Illinois. Our supreme court acknowledged the split decision in Asahi, but found that it need not determine which theory was correct because neither the broad nor narrow version was satisfied. The court found that "[u]nder either interpretation of the stream of commerce theory, it is clear that purposeful availment of the forum's market requires, at a minimum, that the alien defendant is 'aware that the final product is being marketed in the forum State.' " (Emphasis in original.) Wiles, 125 Ill. 2d at 160, quoting Asahi, 480 U.S. at 117, 94 L. Ed. 2d at 107, 107 S. Ct. at 1035 (Brennan, J., joined by White, Marshal, and Blackmun, JJ.). Without any evidence that the foreign manufacturer was aware that its products were destined for Illinois, under either theory it "made no effort, directly or indirectly, to serve the market for its product in Illinois." Wiles, 125 Ill. 2d at 160.

In light of Wiles, we also need not join the debate on the proper scope of the stream of commerce theory to resolve this appeal. At a minimum, it must be demonstrated that Halsey was aware the products it placed in the stream of commerce were being marketed in Illinois. There is simply no evidence in the record showing such an awareness.

Certainly Halsey was aware that hundreds of thousands of its products were being distributed and marketed nationally through a network of lighting stores and national retail chains such as Home Depot and Lowe's. Halsey arranged for direct delivery of some of its products to some of these retailers, and somewhere between 70% and 85% of its sales were destined for the

12

United States market. However, Halsey had no control over the specific distribution of its fans in this country and was not aware where all of its products were marketed or sold. Specifically, the evidence did not demonstrate that Halsey had any knowledge that any of Casablanca's distributors, including Home Depot or Lowe's, were located in Illinois. Pearson himself admitted he had no knowledge Halsey was ever informed its products were being distributed or sold in Illinois. Without any evidence of such knowledge, we cannot say that Halsey had sufficient minimum contacts with Illinois to justify the exercise of personal jurisdiction under any formulation of the stream of commerce theory. See Wiles, 125 Ill. 2d at 161 ("while it would be reasonable to assume that [defendant] had availed itself of the United States market, there is no showing in the record that [defendant] purposefully directed its products into Illinois").

Casablanca acknowledges the Wiles decision, but contends it is distinguishable on the grounds that it involved only a single transaction and a small number of products entering the United States as opposed to the hundreds of thousands of ceiling fans at issue in this case. Casablanca contends that this case is more similar to Worldtronics International, Inc. v. Ever Splendor Enterprise Co., 969 F. Supp. 1136 (N.D. Ill.1997).

In that case, Ever Splendor, a Taiwanese original equipment manufacturer, sold its products to distributors which in turn imported those products to the United States. The manufacturer was aware that its products were being sold nationally through K mart and would occasionally ship products directly to K mart's warehouse for its customers. Worldtronics, 969 F. Supp. at 1138. However, the manufacturer contended that it had no direct connection to the

13

United States or Illinois and that its customers were free to distribute its product anywhere in the world at their own discretion. Worldtronics, 969 F. Supp. at 1138. The federal district nevertheless found Ever Splendor subject to Illinois personal jurisdiction under a stream of commerce theory. Worldtronics, 969 F. Supp. at 1141-42.

While Casablanca is correct that Worldtronics contains a number of similarities to this case, it ignores the most salient difference; that there was evidence Ever Splendor was aware its products were being distributed in Illinois. The court specifically noted that the products were sold through an "established distribution channel" and Ever Splendor was aware of the ultimate destination of its products. Worldtronics, 969 F. Supp. at 1138. Moreover, Ever Splendor was obligated by a contract with one of its customers to indemnify that customer in a separate patent lawsuit then pending in Illinois. Worldtronics, 969 F. Supp. at 1139. Thus, there is nothing about the Worldtronics decision that modifies the requirement that Halsey be aware that its products were being sold or marketed in Illinois.

We also find unpersuasive Casablanca's argument that there is jurisdictional significance in the attendance of Halsey employees at national trade shows held in Chicago. Halsey never formally participated in those shows, its products were not on display there, and its employees never conducted any business meetings there. More importantly, there is no connection between Halsey's attendance at the Chicago trade show and plaintiff's lawsuit and this activity therefore fails to establish jurisdiction. See Bolger v. Nautica International, Inc., 369 Ill. App. 3d 947, 951-52 (2007) (finding no general jurisdiction arising out of trade show attendance); Berthold Types Ltd. v. European Mikrograf Corp., 102 F. Supp. 2d 928, 933-34 (N.D. Ill. 2000) (finding

neither general nor specific jurisdiction from trade show attendance).

We therefore find that the evidence has failed to establish Halsey has minimum contacts with Illinois sufficient to establish personal jurisdiction. In light of this finding, we need not further address the remaining elements of the federal due process analysis. Wiles, 125 Ill. 2d at 161. Moreover, while typically Illinois courts must consider whether the exercise of personal jurisdiction satisfies both the federal and state due process requirements (Commerce Trust, 366 Ill. App. 3d at 141; Kostal, 357 Ill. App. 3d at 387-88), here any further analysis of the state constitutional requirements is unnecessary as our long-arm statute requires that both constitutional guarantees be satisfied. See 735 ILCS 5/2-209(c) (West 2004); Presley v. P&S Grain Co., 289 Ill. App. 3d 453, 461 (1997).

CONCLUSION

For the foregoing reasons, the trial court's denial of Halsey's motion to quash and dismiss is reversed, and this cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

FITZGERALD SMITH, P.J., and TULLY, J., concur.