SOUTH 51 DEVELOPMENT CORPORATION, d/b/a Cash Express of Southern Illinois, *et al.*, Plaintiffs-Appellants, v. SARAH D. VEGA, as Director of the Department of Financial Institutions, Defendant-Appellee.

First District (2nd Division)   Nos. 1—01—3251, 1—01—3255, 1—01—3260 cons.

Opinion filed November 26, 2002.

Winston & Strawn (Dan K. Webb, Bruce R. Braun, and Raymond W. Mitchell, of counsel), and Thomas Rakowski & Associates, Chtrd., both of Chicago, for appellants Advance America, Check Into Cash and Check 'n Go.

Lord, Bissell & Brook, of Chicago (Terrence P. Canade, Hugh C. Griffin, and Hugh S. Balsam, of counsel), for appellant Cottonwood Financial, Ltd.

Schiff, Hardin & Waite, of Chicago (Ronald S. Safer, of counsel), for appellant South 51 Development Corporation.

James E. Ryan, Attorney General (Deborah L. Ahlstrand, Assistant Attorney General, of counsel), William J. Harte, Ltd. (William J. Harte, Special Assistant Attorney General, of counsel), and Williams, Collins & Bax, P.C., all of Chicago, for appellee.

Richard A. Devine, State's Attorney (Robert J. Ruiz, Thomas A. Riech, and Frank J. Parkerson, Assistant State's Attorneys, of counsel), Tabet, DiVito & Rothstein, L.L.C. (Gino L. DiVito, Cesar A. Tabet, and Karine H. De-Hayes, of counsel), both of Chicago, and Deborah M. Zuckerman and Michael Schuster, of AARP Foundation, of Washington, D.C., for *amici curiae*.

JUSTICE CERDA delivered the opinion of the court:

This case involves a challenge by plaintiffs, South 51 Development Corporation, d/b/a Cash Express of Southern Illinois, Midwest Title Loans, Inc., Cottonwood Financial, Ltd., Advance America, Cash Advance Centers of Illinois, L.L.C., d/b/a National Cash Advance,

Check Into Cash of Illinois, LLC, and Check 'n Go of Illinois, Inc.[1], to the validity of legislation amending the Consumer Installment Loan Act (the Loan Act) (205 ILCS 670/1 *et seq.* (West 2000)), and certain short-term lending rules promulgated pursuant to the amendatory legislation by defendant, Sarah Vega, as Director of the Illinois Department of Financial Institutions (Department). Upon the Director's motion, the circuit court dismissed plaintiffs' lawsuit. Plaintiffs now appeal and, upon leave from this court, several *amici* briefs were filed in support of each party's respective positions. For the reasons that follow, we affirm.

The Department is the Illinois agency responsible for regulating the practices of certain financial lending institutions conducting business in this state. Lenders specifically engaged in the business of extending loans in principal amounts not exceeding $25,000, and charging a rate of interest greater than that permitted by State usury laws, are regulated by the Department under the Loan Act and departmental regulations promulgated in accordance with the Loan Act's statutory scheme. One type of lender falling within the Department's oversight includes so-called "short-term lenders," which are generally characterized by the small dollar amount and short duration of their loans.

In mid-1990, the Department was commissioned by our General Assembly to conduct a study of the short-term lending industry in Illinois. The Department's findings and analysis were published in a formal report, entitled *Illinois Department of Financial Institutions Short Term Lending Final Report* (hereinafter, the Report), issued in September 1999.

According to the Report, the number of short-term lenders operating in Illinois has increased dramatically over the past two decades. The State's industry is generally comprised of two types of lenders: payday lenders and title-loan companies. Payday lenders are individually licensed offices that lend relatively small amounts of money to the consuming public for terms not usually exceeding two weeks, to coincide with the borrower's pay cycle. A general lack of preloan procedures allows borrowers to obtain cash quickly and easily. The borrower secures her loan by providing the lender a postdated check, covering the amount financed plus a finance charge, which is held until either the loan is satisfied or the check is cashed. On average, payday lenders charge $20 per $100 borrowed for the typical two-week period. Computed over a one-year period, the lender's fee translates to an annual percentage rate (APR) of 521.43%.

---

[1] Plaintiff Midwest Title Loans is not a party to the present appeal.

Title-loan companies are also individually licensed offices offering single-payment loans, usually for a term of 30 days, that are secured by the customer's automobile title. Like payday lenders, title lenders provide consumers ready access to cash and charge annual interest rates well in excess of 100%.

While acknowledging that short-term lenders fill a credit void for a segment of the borrowing public, much of the report highlights the pitfalls encountered by borrowers in using short-term loans. Citing the ease and expediency in which cash can be obtained, the Report found consumers are willing to incur higher borrowing costs in exchange for the convenience offered by short-term loans. Contrary to industry claims that the market is primarily comprised of individuals who, due to some unforeseen circumstances, need immediate access to cash until their next payday, the Department found that the typical customer, who according to a Department survey earns just over $24,000 a year, is not a one-time borrower occasioned by some unexpected financial obligation. According to the Report, customers "rarely" borrow a single time and, in many cases, are repeat borrowers. The Department's survey found that the typical borrower remains a customer for at least six months following consummation of the original loan and has an average of nearly 11 loan contracts with a single short-term lender. The explosive growth and financial success within the industry, the Report explains, are largely attributed to the repeat business of borrowers.

Most customers, the Department found, do not, or cannot, repay their loans when they become due. As a result, many customers are required to refinance their original loan by either (1) extending the initial period of the loan (referred to as "rolling over"), or (2) securing a new loan to cover the amount of the original sum. In both instances, the cost of the original loan increases to the borrower.

The Report identifies two types of borrowers who are particularly susceptible to experience problems with short-term loans. The Report deems these individuals "captive borrowers" and describes the first type of borrower as one who, due to limited financial resources and availability to other credit options, has no choice but to borrow from short-term lenders. Due to their financial circumstances, these borrowers are considered a high risk to lenders which, in turn, charge higher fees than those usually charged in other loan transactions. Not being constrained by any sort of rate cap, lenders typically seize the opportunity to maximize revenues by setting rates greater than the actual risk assumed.

The other type of borrower identified is one who gets entrapped in a cycle of debt caused by an inability to pay off the original loan due to

excessive costs. These borrowers, according to the Report, "consider the use of *** [short-term] loans to be a cash-flow decision rather than a loan or credit decision." Unable to timely satisfy their original obligations, these individuals frequently renew their loans, incurring added costs. Further unable to pay each renewal when it becomes due, these individuals become stuck in a cycle of unmanageable debt.

The Report recognizes short-term borrowing may prove more economical for consumers than accessing cash or credit from traditional financial institutions like banks and credit card issuers. The Report, however, feared most consumers are not financially astute and, consequently, are unable to truly understand the costs associated with their borrowing activities. Given the short maturation periods of the loans, borrowers principally concern themselves with the periodic fee charged by the lender and pay scant, if any, attention to the loan's APR. The Report posits that since most consumers fail to satisfy their initial obligations when they become due, borrowers would be better served if they concentrated more on the APR and its effect over the life of the loan.

When utilized properly and responsibly, short-term lenders, the Report recognizes, provide a needed and beneficial service to certain segments of the borrowing population, especially to those "people with questionable credit or those that have incurred unexpected expenses." Only when borrowers use short-term loans for extended periods of time or for reasons other than financial hardship do problems arise.

While cognizant of borrower misuse and imprudence, the Report does not exculpate short-term lenders for the ills associated with the industry. Suggesting short-term lenders hold the upper hand in many of their loan transactions, the Report indicates lenders foster borrower irresponsibility in order to maximize revenues, most notably by allowing financially strapped consumers to roll over their existing obligations. The Report expressly notes that departmental regulations have proved ineffective "in stopping people from converting a short term loan into a long term headache" and suggests actions aimed at curbing lender profits generated from rollovers so as to ensure the financial stability of consumers. Stating previous legislative changes to the Loan Act have been inadequate to address the ever-changing nature of the short-term lending industry, the Report specifically recommended enactment of a short-term lending statute to confront the issues and concerns raised by short-term lending practices and, in particular, the customer's ability to roll over their loan obligations.

In response to the Department's study, Senator Patrick O'Malley introduced Senate Bill 1275 (SB 1275) (91st Ill. Gen. Assem., Senate Bill 1275, 1999-2000 Sess.), which proposed the enactment of a short-

term lending statute. The proposed bill represented new legislation, separate and apart from the Loan Act, and sought, among other things: to impose a maximum $500 cap on the principal amount on a loan secured by a postdated check and a $2,000 cap on the principal amount of any other short-term loan; to restrict a customer's ability to refinance a loan to a total of two times and only when the loan's previous outstanding balance has been reduced by 25%; and to set forth a 30-day waiting period between the time a customer satisfied one loan and applied for a new loan. SB 1275 ultimately failed to pass muster in the Senate.

A subsequent bill, Senate Bill 355 (SB 355) (91st Ill. Gen. Assem., Senate Bill 355, 2000 Sess.), was sponsored by Senator O'Malley that proposed amending section 22 of the Loan Act to broaden the Department's rulemaking powers in protecting consumers. SB 355 was overwhelmingly approved by the General Assembly and was enacted in Public Act 91—698 (the Amendment) (Pub. Act 91—698, eff. May 6, 2000). With the Amendment, section 22 of the statute now provides:

> "The Department may make and enforce such reasonable rules, regulations, directions, orders, decisions, and findings as the execution and enforcement of the provisions of this Act require, and as are not inconsistent therewith. *In addition, the Department may promulgate rules in connection with the activities of licensees that are necessary and appropriate for the protection of consumers in this State.* All rules, regulations and directions of a general character shall be printed and copies thereof mailed to all licensees." (Emphasis added to highlight amendatory language.) 205 ILCS 670/22 (West 2000).

The Department, pursuant to the authority granted by the Amendment, issued "Short-Term Lending Rules" (the Rules) (38 Ill. Adm. Code §§ 110.300 through 110.410 (2002)), which, after some contestation that will be discussed later in this opinion, became effective August 1, 2001.

By their lawsuit, plaintiffs, each an owner and operator of licensed short-term lending businesses in Illinois, seek to declare the Amendment unconstitutional and the Rules void or, alternatively, invalid. Plaintiffs assert the Amendment, authorizing the Department to promulgate rules that are "necessary and appropriate for the protection of consumers," is so broad and devoid of any meaningful standards to guide the Department's rulemaking authority that the Amendment constitutes an unlawful delegation of legislative power. This improper delegation, plaintiffs further contend, renders the Amendment unconstitutionally vague. Plaintiffs additionally argue

that the Department, in promulgating the Rules, assumed a legislative function, impermissibly usurping the role of our General Assembly and thereby rendering the Rules void. Alternatively, plaintiffs claim the Rules are invalid since they (1) conflict with and exceed the scope of the Loan Act and (2) were adopted in violation of the Illinois Administrative Procedure Act (the Procedure Act) (5 ILCS 100/1—1 *et seq.* (West 2000)).

In moving to dismiss plaintiffs' complaints pursuant to section 2—619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2—619(a)(9) (West 2000)), the Director argues the Amendment clearly bridles the Department's discretion in promulgating rules for consumer protection and, thus, constitutes a proper delegation of legislative authority. For the same reason, the Director asserts, the Amendment is not impermissibly vague. The Director additionally asserts the Rules were promulgated within the Department's statutory grant of authority and are further consistent with the purpose and substantive provisions of the enabling legislation. The Director finally maintains the Rules were adopted in accord with the Procedure Act's rule-adoption mandates.

■ A motion to dismiss under section 2—619(a)(9) acknowledges the plaintiff's cause of action but presents affirmative matters that avoid the legal effect of the claim. *Golden v. Mullen*, 295 Ill. App. 3d 865, 869, 693 N.E.2d 385, 389 (1997). All pleadings and supporting documents must be construed in the light most favorable to the nonmoving party, and the motion should be granted only where no material facts are in dispute and the defendant is entitled to dismissal as a matter of law. *Mayfield v. ACME Barrel Co.*, 258 Ill. App. 3d 32, 34, 629 N.E.2d 690, 693 (1994). The relevant inquiry on appeal is "whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law." *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17, 619 N.E.2d 732, 735 (1993). Appellate review of a dismissal pursuant to section 2—619 is conducted *de novo. Spillyards v. Abboud*, 278 Ill. App. 3d 663, 668, 662 N.E.2d 1358, 1361-62 (1996).

I

■ We first address whether the Amendment represents an improper delegation of legislative authority to the Department. Statutes are presumed constitutional (*East St. Louis Federation of Teachers, Local 1220 v. East St. Louis School District No. 189 Financial Oversight Panel*, 178 Ill. 2d 399, 412, 687 N.E.2d 1050, 1058-59 (1997)), and we have a duty to sustain legislation whenever

reasonably possible. *In re R.C.*, 195 Ill. 2d 291, 296, 745 N.E.2d 1233, 1237 (2001); *Allen v. Illinois Community College Board*, 315 Ill. App. 3d 837, 843, 734 N.E.2d 926, 931 (2000). A party challenging a statute's validity bears a heavy burden of clearly establishing that the subject legislation is unconstitutional. *Allen*, 315 Ill. App. 3d at 843, 734 N.E.2d at 931. The constitutionality of a statute presents a question of law that we review *de novo. People v. Kolzow*, 319 Ill. App. 3d 673, 675, 746 N.E.2d 27, 29 (2001).

■ The principle of separation of powers is embodied in article II, section 1, of the Illinois Constitution of 1970: "The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another." Ill. Const. 1970, art. II, § 1. Under this clause, each of the three governmental branches possesses its own unique sphere of authority that cannot be exercised by another branch. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 410, 689 N.E.2d 1057, 1078 (1997). The separation of powers clause, however, "does not create rigid boundaries prohibiting every exercise of functions by one branch of government which ordinarily are exercised by another." *Pucinski v. County of Cook*, 192 Ill. 2d 540, 547, 737 N.E.2d 225, 229 (2000).

■ The law is well settled that the General Assembly may grant an administrative agency discretionary powers to decide an issue provided it establishes standards under which the agency's discretion may be exercised. *School District No. 79 v. County Board of School Trustees of Lake County*, 4 Ill. 2d 533, 536, 123 N.E.2d 475, 476 (1954). As explained by our supreme court:

> "The power to make the laws is a sovereign power vested in the legislature, and this power cannot be delegated to an administrative body. [Citation.] While the legislature cannot delegate its legislative power to determine what the law should be, it may delegate the authority to execute the law. [Citation.] Proper delegation of authority must provide sufficient standards to guide the administrative body in the exercise of its functions. [Citation.] However, '[a]bsolute criteria whereby every detail necessary in the enforcement of a law is anticipated need not be established by the General Assembly. The constitution merely requires that intelligible standards be set to guide the agency charged with enforcement.' [Citation.]" *Local 1220*, 178 Ill. 2d at 423, 687 N.E.2d at 1063-64.

"In an attempt to endow the requisite intelligible standards with a conceptual foundation" (*Thygesen v. Callahan*, 74 Ill. 2d 404, 409, 385 N.E.2d 699, 701 (1979)), our supreme court has declared a legislative delegation of power to be proper if the General Assembly provides

"sufficient identification" of: (1) the persons and activities potentially subject to regulation; (2) the harm sought to be prevented; and (3) the general means intended to be available to the administrator to prevent the identified harm. *Stofer v. Motor Vehicle Casualty Co.*, 68 Ill. 2d 361, 372, 369 N.E.2d 875, 879 (1977).

Recognizing the inherent ambiguity in the term "sufficient identification," the *Stofer* court explained that the term "will have to receive additional content from its application to particular facts and circumstances." 68 Ill. 2d at 372, 369 N.E.2d at 879. " '[T]he *precision* of the permissible standard must necessarily vary according to the nature of the ultimate objective and the problems involved.' " (Emphasis added.) *People v. Carter*, 97 Ill. 2d 133, 137, 454 N.E.2d 189, 190 (1982), quoting *Hill v. Relyea*, 34 Ill. 2d 552, 555, 216 N.E.2d 795 (1966); see also *Polich v. Chicago School Finance Authority*, 79 Ill. 2d 188, 206, 402 N.E.2d 247, 255 (1980); *Alexander v. Director, Department of Agriculture*, 111 Ill. App. 3d 927, 932, 444 N.E.2d 811, 815 (1983). Moreover, since delegation standards " 'derive much meaningful content from the purpose of [the subject legislation], its factual background and the statutory context in which they appear,' " they must be considered together and not in isolation. *Carter*, 97 Ill. 2d at 137, 454 N.E.2d at 191, quoting *American Power & Light Co. v. Securities & Exchange Comm'n*, 329 U.S. 90, 104, 91 L. Ed. 103, 115, 67 S. Ct. 133, 142 (1946).

■ The Amendment expanded the general rulemaking power of the Department by empowering it to promulgate specific rules "that are necessary and appropriate for the protection of consumers." 205 ILCS 670/22 (West 2000). Plaintiffs concede the legislature has provided sufficient identification of the persons and activities subject to potential regulation, *i.e.*, installment loan lenders falling within the category of licensees under the Loan Act that engage in the business of lending money. Plaintiffs focus solely on the remaining two prongs of the *Stofer* test, claiming the legislature has not adequately specified the harm to be prevented by the Department's rulemaking power and the general means intended to be available to combat that harm.

With regard to the harm sought to be prevented, the legislature may use broader or more generic language than with the first factor. *Stofer*, 68 Ill. 2d at 373, 369 N.E.2d at 879. "It is sufficient if, from the language of the statute, it is apparent what types of evil the statute is intended to prevent." *Stofer*, 68 Ill. 2d at 373, 369 N.E.2d at 879. While the language in *Stofer* seems to indicate that the targeted harm is to be ascertained solely from the statute itself, we believe, pursuant to *Carter*'s expression that delegation standards derive much meaningful content from the statute's "factual background" (*Carter*, 97 Ill. 2d

at 137, 454 N.E.2d at 191), that consideration of the act's legislative history is appropriate. See also *American Power & Light* 329 U.S. at 104-05, 91 L. Ed. at 115, 67 S. Ct. at 142 (looking specifically to the findings of an agency report concerning the evils associated with the pyramided structure of public utility holding company systems in determining whether certain legislation granting the Securities and Exchange Commission authority to oversee certain aspects of the holding company system constituted a valid delegation of legislative power); *Best*, 179 Ill. 2d at 382, 689 N.E.2d at 1065 (noting legislative history may be considered in ascertaining the intent of the legislature if resolution of the issue so requires).

While neither the Loan Act nor the Amendment expressly identifies the purposes sought to be achieved by the legislature, the phrase "necessary and appropriate for the protection of consumers" derives meaning from the Loan Act's provisions as well as the findings set forth in the Department's 1999 report of the short-term lending industry. It is clear from a reading of the Loan Act as a whole that the statute is regulatory and remedial in nature and seeks to promote a more balanced relationship between lenders and borrowers through meaningful disclosures of credit information and the ban of oppressive, deceptive and fraudulent lending practices. See 205 ILCS 670/9 (authorizing fines, suspension and revocation of licenses for noncompliance and violations of statute and departmental rules), 10 (permitting investigations to determine compliance and to secure lawful information), 11 (requiring recordkeeping by licensees and forwarding of information upon request by the Department), 15 (setting forth the type of charges that may be imposed by licensees and the manner in which they may be collected), 15d (limiting the type of charges that may be levied), 16 (mandating certain material disclosures by lenders relating to loan transactions), 17 (restricting the term and amount of consumer loans), and 18 (regulating the nature of lender advertising and prohibiting "false, misleading or deceptive" advertising) (West 2000); see also *Kraft v. No. 2 Galesburg Crown Finance Corp.*, 95 Ill. App. 3d 1044, 1046, 420 N.E.2d 865, 867 (1981) (stating the Loan Act is remedial in nature and designed to " 'ensure a meaningful disclosure of credit terms *** to more easily compare the various credit terms available to [the borrower] and avoid the uninformed use of credit' "), quoting *Holmes v. No. 2 Galesburg Crown Finance Corp.*, 77 Ill. App. 3d 785, 788, 396 N.E.2d 583 (1979).

Upon being commissioned to examine this state's short-term lending industry, the Department determined that the industry is plagued by a market of borrowers who routinely become entrapped in a continuous cycle of debt due to an overextension of their credit posi-

tions. Pointing to the borrowing public's general failure to comprehend the implications of extending short-term loans beyond their original terms, the Department identified a need to raise consumer awareness about the true costs of short-term borrowing and specifically the import and operation of the APR over the life of a loan. Compounding the situation, the Department found, is the industry's practice of allowing borrowers to freely roll over their original obligations or to secure new loans in order to pay off existing ones. The Department concluded further action was needed to promote consumer responsibility through increased education and to curb lender refinancing practices that foster borrower irresponsibility and perpetuate consumer indebtedness.

When the amendatory phrase "necessary and appropriate for the protection of consumers" is considered in light of the underlying purposes of the Loan Act and, more specifically, the findings contained in the Department's report, it is clear the General Assembly intended to address consumer unconcern regarding their borrowing activities and lender practices that lead borrowers to incur unmanageable levels of personal debt. Contrary to plaintiffs' assertion, the Department is not given unbridled discretion to promulgate whatever rules it deems "necessary and appropriate." Rather, the Department's authority is limited to the promulgation of rules that are necessary and appropriate to specifically stem the debt flow occasioned through liberal refinancings of short-term loans and to increase consumer awareness of the pecuniary implications in using short-term loans for purposes and time periods other than for those for which they were designed. The fact the Amendment does not explicitly reference short-term loans is of no consequence since the legislative history clearly indicates that the Amendment was spurred by the Department's study of the short-term lending industry.

We further find the legislature has sufficiently identified the general means by which the targeted harm is to be remedied. In this regard, "the legislature must specifically enumerate the *administrative tools* (*e.g.*, regulations, licenses, enforcement proceedings) and the particular sanctions, if any, intended to be available." (Emphasis added.) *Stofer*, 68 Ill. 2d at 373, 369 N.E.2d at 879. Here, the administrative tools specified for use by the Department are "rules," which, in our view, are synonymous with regulations. See *United Consumers Club, Inc. v. Attorney General*, 119 Ill. App. 3d 701, 709, 456 N.E.2d 856, 864 (1983) (finding legislative delegation to Attorney General that empowered executive agent to " 'promulgate rules and regulations as may be necessary' " sufficiently identified means by which agent was to combat targeted harm), quoting Ill. Rev. Stat.

1981, ch. 121½, par. 264a; *Alexander*, 111 Ill. App. 3d at 931, 444 N.E.2d at 814 (finding means adequately identified where administrative agency was directed to promulgate "rules and regulations"); *Franciscan Hospital v. Town of Canoe Creek*, 79 Ill. App. 3d 490, 494, 398 N.E.2d 413, 416 (1979) (stating "regulations" are sufficient identification of administrative tools to be used in remedying harm).

Plaintiffs assert the present case is virtually indistinguishable from *Thygesen*, where the supreme court invalidated as an unlawful delegation of legislative power a provision of "An Act in relation to *** community currency exchanges ***" (Ill. Rev. Stat. 1977, ch. 16½, par. 49.3) that required the Director of Financial Institutions to adopt rules formulating and issuing "schedules of maximum rates which can be charged for check cashing and writing of money orders by community currency exchanges and ambulatory currency exchanges." Focusing on the second prong of the *Stofer* test, the court held that no identifiable purpose could be discerned from either the statutory provision or the act itself as to why the legislature wanted the Director to set maximum rate schedules for cashing checks and issuing money orders. *Thygesen*, 74 Ill. 2d at 410, 385 N.E.2d at 701-02. This failure, according to the court, was "compounded by [the legislature's] failure to set forth any meaningful standards to guide [the Director] in setting the maximum rates." *Thygesen*, 74 Ill. 2d at 410, 385 N.E.2d at 702. The only provision asserted to restrict the Director's discretion was an omnibus provision of the statute providing that the Director " 'may make and enforce such *reasonable*, relevant regulations, directions, orders, decisions and findings as may be necessary for the execution and enforcement' of the Currency Exchange Act." (Emphasis in original.) *Thygesen*, 74 Ill. 2d at 410-11, 385 N.E.2d at 702, quoting Ill. Rev. Stat. 1977, ch. 16½, par. 49.

Unlike the statutory provision involved in *Thygesen*, the Amendment here adequately identifies the harm sought to be remedied. As discussed in detail, the legislature's grant of additional rulemaking power to the Department contemplated regulatory action to protect short-term borrowers from becoming entrenched in an endless cycle of debt. While the *Thygesen* court was not persuaded by the requirement that the administrative body's discretion was to be exercised reasonably, it is clear from the opinion that the court's overriding concern was with the lack of any identifiable purpose for the legislature's delegation of authority. Without sufficient indication of the harm, no meaningful standards existed to guide the agency in determining what rules setting maximum rates were reasonable. No such problem is presented by the legislature's delegation in the instant case. Furthermore, since the harm to be remedied was not adequately identified,

the court, contrary to plaintiffs' contention, never reached the issue of whether the legislature had sufficiently identified the general means to be available.

For the foregoing reasons, we find *Thygesen* inapposite and conclude that the Amendment represents a valid delegation of legislative authority to the Department.

## II

In a related argument, plaintiffs claim the Amendment is unconstitutionally vague. According to plaintiffs, the Amendment is so ill-drafted and devoid of any standards that it wholly fails to define, limit or restrict the discretion of the Department's rulemaking power.

■ Due process requires that a statute shall not be vague, indefinite or uncertain and that it must provide sufficient standards to guide the administrative agency in the exercise of its functions. *People ex rel. Stamos v. Public Building Comm'n of Chicago*, 40 Ill. 2d 164, 174, 238 N.E.2d 390, 397 (1968); *Allen*, 315 Ill. App. 3d at 846, 734 N.E.2d at 933; *Escalona v. Board of Trustees, State Employees Retirement System*, 127 Ill. App. 3d 357, 362-63, 469 N.E.2d 297, 301 (1984). The question of vagueness is intertwined with the question of legislative delegation "insofar as both address the standards given in the statute to guide the conduct the statute regulates and the administrative body that oversees that conduct." *Local 1220*, 178 Ill. 2d at 424, 687 N.E.2d at 1064. In this respect, adequate standards must be provided by the legislature to satisfy both due process and the delegation-of-legislative-authority requirement. *People v. Gurell*, 98 Ill. 2d 194, 210, 456 N.E.2d 18, 25 (1983).

■ As previously discussed, the Amendment provides sufficiently intelligible standards to guide the Department's rulemaking discretion and, accordingly, is not impermissibly vague. See *Allen*, 315 Ill. App. 3d at 846, (finding legislative delegation of authority to administrative agency not unconstitutionally vague where it set forth intelligible standards to guide the agency in the exercise of its legislatively conferred power); *Alexander*, 111 Ill. App. 3d at 933, 444 N.E.2d at 816 (same).

## III

Plaintiffs next maintain the Rules are void as an unconstitutional usurpation of legislative power by the Department. Observing that several key provisions of the Rules incorporate or substantially mirror various aspects of the proposed legislation considered and rejected in SB 1275, plaintiffs claim the Rules contravene the will and intent of our General Assembly that the proposed provisions of the short-term lending statute not be enacted into law. Such a contravention of legisla-

tive will, plaintiffs argue, demonstrates that the Department was effectively acting in the legislative capacity to determine the public policy of this state.

■ Administrative rules and regulations have the force and effect of law and, like statutes, enjoy a presumption of validity. *Granite City Division of National Steel Co. v. Illinois Pollution Control Board*, 155 Ill. 2d 149, 164, 613 N.E.2d 719, 726 (1993). Courts have a duty to affirm the constitutionality of administrative rules and regulations if reasonable, and any doubts in their construction must be resolved in favor of the rules' validity. *Granite City*, 155 Ill. 2d at 164-65, 613 N.E.2d at 726.

■ While we agree with the general premise that an administrative body is not free to undermine the express intent of our General Assembly, we do not share plaintiffs' claim that rejected legislation unequivocally evinces a wholesale legislative disapproval of the substance of failed legislation. As recognized by the United States Supreme Court, legislative inaction " 'lacks persuasive significance because several equally tenable inferences may be drawn from such inaction.' " *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 187, 128 L. Ed. 2d 119, 138, 114 S. Ct. 1439, 1453 (1994), quoting *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 663, 650, 110 L. Ed. 2d 579, 597, 110 S. Ct. 2668, 2678 (1990). "A bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 170, 148 L. Ed. 2d 576, 586, 121 S. Ct. 675, 681 (2001); see also *Rice v. CertainTeed Corp.*, 84 Ohio St. 3d 417, 421, 704 N.E.2d 1217, 1220 (1999) ("[a] bill may fail for numerous unexpressed reasons that are unrelated to the merit or content of any one proposed provision"). The legislature " 'cannot express its will by a *failure* to legislate. The act of refusing to enact a law *** has utterly no legal effect, and thus has utterly no place in a serious discussion of the law. *** [A legislative body] can no more express its will by not legislating than an individual Member can express his will by not voting.' " (Emphasis in original.) *Rice*, 84 Ohio St. 3d at 421, 704 N.E.2d at 1220, quoting *United States v. Estate of Romani*, 523 U.S. 517, 535-36, 140 L. Ed. 2d 710, 726, 118 S. Ct. 1478, 1488-89 (1998) (Scalia, J., concurring in part and concurring in the judgment); see also *People v. Baniqued*, 85 Cal. App. 4th 13, 28, 101 Cal. Rptr. 2d 835, 845 (2000) ("[a]s evidence of legislative intent, unpassed bills are of little value [citation] and arguably irrelevant").

The General Assembly's rejection of SB 1275 does not, in our view, reveal a legislative disapproval of the substance of the failed legislation. Since the legislature's intent cannot be gleaned from its rejection

of SB 1275, we find plaintiffs' reliance on *Cooper v. Swoap*, 11 Cal. 3d 856, 524 P.2d 97, 115 Cal. Rptr. 1 (1974), unavailing.

Alternatively, plaintiffs argue the Rules are void because they in certain material respects conflict with and exceed the scope of the Loan Act. While, as plaintiffs correctly observe, an agency may not issue rules and regulations that alter, extend or limit the operation of the conferring statute (*Pekin Memorial Hospital v. Department of Public Aid*, 273 Ill. App. 3d 259, 262, 653 N.E.2d 70, 73 (1995); *Montgomery Ward Life Insurance Co. v. Department of Local Government Affairs*, 89 Ill. App. 3d 292, 302, 411 N.E.2d 973, 980 (1980)), we find that not to be the case with the Department's rulemaking in the instant case. Upon close examination of the Rules *vis-a-vis* the provisions of the statute, we conclude the Rules are consistent with and do not transcend the scope of the Loan Act's statutory scheme.

## IV

■ Plaintiffs lastly claim the Rules are invalid because they were not adopted in conformance with the Procedure Act. The Procedure Act sets forth the general procedures to be followed for the adoption of administrative rules and regulations. 5 ILCS 100/5—5 (West 2000); *Riverboat Development Corp. v. Illinois Gaming Board*, 268 Ill. App. 3d 257, 259, 644 N.E.2d 10, 11 (1994).

In relevant part, the Procedure Act directs the business assistance officer of the Department of Commerce and Community Affairs (DCCA) to prepare an impact analysis describing the rule's effect on small businesses whenever requested to do so by, *inter alia*, the Joint Committee on Administrative Rules (JCAR). 5 ILCS 100/5—30(c) (West 2000). JCAR is a bipartisan, bicameral legislative support services agency responsible for generally monitoring the agency rulemaking process. 25 ILCS 130/1—5(a)(3), 2—1 (West 2000); 5 ILCS 100/5—100 *et seq.* (West 2000). Pursuant to a request by JCAR in this case, DCCA studied the potential impact of the Department's proposed rules on the short-term lending industry and presented its formal findings in September 2000.

Plaintiffs do not claim that DCCA failed to perform the requested impact analysis. Nor do they quarrel with the methodology used by DCCA in conducting its analysis. Instead, characterizing DCCA's report as "superficial," plaintiffs take issue with the facial sufficiency of DCCA's study.

Pursuant to section 5—30(c) of the Procedure Act, DCCA's impact analysis must contain: (1) a summary of the projected reporting, recordkeeping, and other compliance requirements of the proposed rule; (2) a description of the types and an estimate of the number of small

businesses to which the proposed rule will apply; (3) an estimate of the economic impact that the regulation will have on the various types of small businesses affected by the rulemaking; and (4) a description or listing of alternatives to the proposed rule that would minimize the economic impact of the rule. 5 ILCS 100/5—30(c) (West 2000). Neither section 5—30(c) nor any other provision of the Procedure Act provides for judicial review of the adequacy of DCCA's impact analysis. We have further found no reported Illinois decision discussing the propriety or parameters of such review.

Under a similar provision contained in the 1981 version of the Model State Administrative Procedure Act § 3—101 *et seq.*, 15 U.L.A. 34 (2000) (Model Act), judicial review concerning the facial adequacy of a regulatory flexibility analysis is limited to ascertaining whether the agency made *"a good faith effort"* to comply with statutory mandates. Model State Administrative Procedure Act § 3—105(f), 15 U.L.A. 40 (2000). If so, according to the Model Act, the rule may not be invalidated on the ground that the contents of the regulatory analysis are insufficient. 15 U.L.A. 40 (2000).[2]

An agency's "good faith effort" is to be ascertained without judicial evaluation of the actual sufficiency of the contents of the regulatory analysis. 15 U.L.A. 41, Comment (2000). Rather than placing the onus on the courts to monitor an agency's compliance with regulatory analysis mandates, the Model Act relies on the "political muscle" of the administrative rules review committee and other involved parties to assure adequate compliance with the statute. 15 U.L.A. 40-41, Comment (2000). A court's inquiry is limited to determining whether the analysis was actually issued and, if so, whether on its face the analysis actually addresses in some manner all of the points required by the statute. 15 U.L.A. 41, Comment (2000). If the analysis does so, the sufficiency of its contents is not subject to judicial review. 15 U.L.A. 41, Comment (2000). To permit judicial inquiries into the adequacy of the contents set forth in a regulatory analysis, the Model Act posits, would

---

[2]A similarly limited standard of review is employed by the federal courts in considering the facial sufficiency of impact assessments prepared under the Regulatory Flexibility Act (5 U.S.C. § 601 *et seq.* (2000)), the federal administrative statute requiring agencies to assess the impact of their rules on small businesses. 5 U.S.C. § 604 (2000). Under this standard, the federal courts inquire whether the agency made a reasonable, good-faith effort to carry out the statute's mandate. *United States Cellular Corp. v. Federal Communications Comm'n*, 254 F.3d 78, 88 (D.C. App. 2001); *Alenco Communications, Inc. v. Federal Communications Comm'n*, 201 F.3d 608, 625 (5th Cir. 2000); *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997).

encourage claims of inadequacy aimed simply at harassing agencies and, hence, interfere in an agency's rulemaking efforts. 15 U.L.A. 40-41, Comment (2000).

In our view, the two-prong approach set forth by the Model Act is grounded in sound policy and reflects the most appropriate standard of review in addressing a challenge to the facial sufficiency of a DCCA impact analysis. In the present case, it is undisputed that DCCA fulfilled its statutory obligation to prepare and issue an analysis regarding the potential economic impact of the Department's proposed rules. Upon an examination of that report, we are satisfied that the agency made a good-faith effort to comply with the Procedure Act. The analysis details a number of the proposed compliance requirements, generally identifies the businesses to be affected as those engaged in providing short-term loans and lists payday lenders and currency exchanges in particular, estimates the potential number of establishments affected at 800, and recommends reconsideration and change to certain compliance requirements. While DCCA found the economic impact of the rules "hard to gauge," DCCA did not rest on that conclusory assertion. DCCA specifically indicated that lenders could experience decreased revenues in light of proposed caps on the amount of their loans and restrictions on the number of times a borrower's obligation may be rolled over. DCCA further noted, albeit in a different section of its report, that lenders would be required to purchase equipment, and thereby incur costs, to manage compliance with a proposed 30-day "cooling off" period between customer loans. DCCA's analysis, on its face, meaningfully addresses all of the points required by section 5—30(c).

In a further attempt to have the Rules invalidated, plaintiffs assert DCCA's impact analysis was not submitted within the time constraints imposed by section 5—30(c). Under the statute, DCCA's impact analysis "shall be *completed* within" the first notice period, the initial step in the rulemaking process. (Emphasis added.) 5 ILCS 100/5—30(c) (West 2000); 5 ILCS 100/5—40(b) (West 2000). "Upon completion of the analysis, [DCCA] shall submit this analysis" to, among others, JCAR. 5 ILCS 100/5—30(c) (West 2000).

The first notice period in this case began on August 11, 2000, and expired 45 days later (5 ILCS 100/5—40(b) (West 2000)), on September 25, 2000. Plaintiffs assert DCCA "submitted" its report on September 26, 2000, one day after the expiration of the notice period. DCCA's untimely submission, according to plaintiffs, renders the Rules invalid.

Yet, DCCA's submission of its analysis is not expressly constrained by any statutorily fixed period of time. The Procedure Act clearly directs DCCA to only complete, not submit, its impact analysis by the

end of the first notice period. Plaintiffs' claim that DCCA was required to submit its impact analysis to JCAR within the first notice period, therefore, falls on the face of the clear and unambiguous language of the statute.

Plaintiffs' final claim regarding the validity of the Rules concerns the General Assembly's failure to consider a joint resolution issued by JCAR objecting to the Department's proposed rulemaking. Upon its review of the rules, JCAR objected to the Department's proposed rules on the basis they posed a serious threat to public interest, safety, or welfare and presented an unreasonable economic burden on short-term lenders. Notwithstanding, the Department refused to withdraw or modify its rules. JCAR subsequently prohibited the rules on November 29, 2000. JCAR's prohibition stayed the filing and effectuation of the proposed rules for a period of 180 days. 5 ILCS 100/5—115(b) (West 2000).

JCAR subsequently introduced a joint resolution in the General Assembly expressing its desire to continue with its prohibition. Pursuant to section 5—115(c) of the Procedure Act, "[t]he joint resolution shall, immediately following its first reading, be placed on the calender for consideration in each house of the General Assembly without reference to a standing committee." 5 ILCS 100/5—115(c) (West 2000). If the joint resolution is passed by both houses within the 180-day stay period, the proposed rule may never be adopted. Conversely, if the 180-day period expires before passage of the joint resolution, the proposed rule may be filed for implementation. 5 ILCS 100/5—115(c) (West 2000).

Here, the record indicates JCAR's joint resolution was never placed on the legislative calender for consideration but, rather, referred to the rules committee of each house. The General Assembly never acted on the joint resolution within the 180-day stay period and, as a result, JCAR's prohibition expired. The Department filed the rules with the office of the Secretary of State the following day and the rules became effective on August 1, 2001.

According to plaintiffs, placement of the JCAR joint resolution on the legislative calender for consideration by the General Assembly was required and the failure to do so in this case renders the Rules invalid. Not disputing that the joint resolution was not submitted for bicameral consideration, the Director counters that section 5—115(c) is a directory, not mandatory, provision and, as such, the legislature's failure to place the joint resolution on its calender is not fatal to the Rules' validity.

No universal formula exists for differentiating between mandatory and directive statutory provisions. *Kaplan v. Tabb Associates, Inc.*, 276

Ill. App. 3d 320, 323, 657 N.E.2d 1065, 1066 (1995). While use of the word "shall" ordinarily denotes a mandatory obligation (*Armstrong v. Hedlund Corp.*, 316 Ill. App. 3d 1097, 1107, 738 N.E.2d 163, 171 (2000)), the term may take on a permissive or directive meaning depending on the legislature's intent. *Courtney v. County Officers Electoral Board*, 314 Ill. App. 3d 870, 873, 732 N.E.2d 1193, 1195-96 (2000); *Chicago School Reform Board of Trustees v. Martin*, 309 Ill. App. 3d 924, 933, 723 N.E.2d 731, 738 (1999). Generally, if a statute imposes duties and by express terms provides that the omission to perform the duties renders the proceeding void, then courts are bound to construe those provisions as mandatory. Where, however, the statute provides that certain acts are to be done in a particular time and a particular manner and does not declare their performance to be essential to the validity of a proceeding, then the statute is directory. *Pullen v. Mulligan*, 138 Ill. 2d 21, 46, 561 N.E.2d 585, 595-96 (1990); *Presley v. P&S Grain Co.*, 289 Ill. App. 3d 453, 463, 683 N.E.2d 901, 909 (1997); see also *Cooper v. Department of Children & Family Services*, 234 Ill. App. 3d 474, 481, 599 N.E.2d 537, 542 (1992) ("[a] mandatory provision in a statute is one which the omission to follow renders the proceeding to which it relates illegal and void, while a directory provision is the one the observance of which is not necessary to the validity of the proceeding").

We agree with the Director that the legislature's use of the word "shall" in section 5—115(c) is merely directory and not mandatory. Nothing in the statute indicates that noncompliance with the placement directive of section 5—115(c) results in the invalidity of a proposed rule or otherwise renders the rulemaking process void.

Citing, out of context, *Senn Park Nursing Center v. Miller*, 104 Ill. 2d 169, 181, 470 N.E.2d 1029, 1035 (1984), and a number of appellate court cases, plaintiffs maintain compliance with the Procedure Act is mandatory in all respects and that the failure to comply with a single provision of the statute invalidates a proposed rule. The cases relied on by plaintiffs did not hold that noncompliance with any provision of the Procedure Act results in the invalidity of an agency's proposed rule. Instead, the courts were concerned solely with the effect of noncompliance with the general, emergency and peremptory rule-adoption procedures outlined by section 5 of earlier versions of the Procedure Act (Ill. Rev. Stat. 1979, ch. 127, pars. 1005.01, 1005.02, 1005.03; Ill. Rev. Stat. 1983, ch. 127, pars. 1005.01, 1005.02, 1005.03; Ill. Rev. Stat. 1985, ch. 127, pars. 1005.01, 1005.02, 1005.03), now respectively codified in sections 5—40, 5—45 and 5—50 of the current statute (5 ILCS 100/5—40, 5—45, 5—50 (West 2000)). Since section 5 expressly stated that noncompliance with its adoption procedures

rendered a proposed rule invalid (Ill. Rev. Stat. 1979, ch. 127, par. 1005(b); Ill. Rev. Stat. 1983, ch. 127, par. 1005(b); Ill. Rev. Stat. 1985, ch. 127, par. 1005(b)), the courts accordingly held compliance with section 5 was compulsory. *Senn Park*, 104 Ill. 2d at 179, 470 N.E.2d at 1034; *Board of Education of Mundelein Elementary School District No. 75 v. Illinois Educational Labor Relations Board*, 179 Ill. App. 3d 696, 704, 534 N.E.2d 1022, 1027 (1989); *Sleeth v. Department of Public Aid*, 125 Ill. App. 3d 847, 853, 466 N.E.2d 703, 707 (1984).[3]

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

WOLFSON and HALL, JJ., concur.

---

[3]The current version of the Procedure Act contains the same provision considered by the foregoing cases and provides that the validity of an agency's rulemaking actions is dependent upon compliance with only sections 5—40, 5—45 and 5—50 of the statute, whichever is applicable. 5 ILCS 100/5—35(a) (West 2000). Compliance with section 5—115(c) is not referenced and, hence, not mandated.