In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 04-3734, 04-4273

ENRIQUE OLVERA and JEFFREY DAWSON,

*Plaintiffs-Appellants*,

v.

BLITT & GAINES, P.C., *et al.*,

*Defendants-Appellees*.

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 03 C 6717, 04 C 1911—**Matthew F. Kennelly**, *Judge*;
**Charles P. Kocoras**, *Chief Judge*.

_____

ARGUED SEPTEMBER 12, 2005—DECIDED DECEMBER 9, 2005

_____

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. The question presented by these consolidated appeals is whether the assignee of a debt in Illinois is free to charge the same interest rate that the assignor—the original creditor—charged the debtor, rather than the lower, statutory rate, even if the assignee does not have a license that expressly permits the charging of a higher rate. The interest rates that the credit card companies that are the assignors in this case charged delinquent borrowers had been 22.99 percent to Dawson and the

greater of either 20.95 percent, or 18.2 percent plus the prime rate, to Olvera. The companies assigned the plaintiffs' debts to companies that specialize in collecting bad debts. (Actually, Olvera owed the credit card company nothing, but that is not the basis of his suit.) These "bad-debt buyers" claim the right to charge debtors, during the interval between the buyers' purchase of the bad debts and either their collection or their abandonment, the same interest rates that the assignors had charged. In fact the bad-debt buyers charged only 19.7 percent to Dawson and 18.2 percent to Olvera, but the plaintiffs explain that "debt buyers often do this because they have so little information about the debt that the application of complex variable rate formulas is impossible."

Section 5 of the Illinois Interest Act forbids anyone to charge a higher interest rate "than is expressly authorized by this Act or other laws of this State." 815 ILCS 205/5. A creditor not licensed by the state's Department of Financial and Professional Regulation, unless it's a bank or is extending credit under a revolving credit arrangement, is forbidden to charge an interest rate of more than 5 or 9 percent, depending on factors irrelevant to these appeals. 815 ILCS 205/2, 205/4. One of the credit card companies in this case was licensed and the other was a bank, so they violated no law by charging higher interest rates. 815 ILCS 205/4.2. It is unclear which slot for nonexempt creditors our bad-debt buyers belong in—the 5 percent or the 9 percent—but all that matters to the plaintiffs is that the bad-debt buyers are not licensed. This means, the plaintiffs argue, that the interest rates charged by the bad-debt buyers to them, though no higher (actually lower) than the original, lawful interest rates, violate the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.*

How does a violation of state law become a violation of the federal Act? A provision of the Act forbids a debt collector to collect "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." § 1692f(1); *Pollice v. National Tax Funding, L.P.*, 225 F.3d 379, 407-08 (3d Cir. 2000). There was express authorization in the credit agreements, but the plaintiffs argue that, despite the disjunctive wording of the statute, "if state law expressly prohibits service charges, a service charge cannot be imposed even if the contract allows it." *Id.* (dictum); *Tuttle v. Equifax Check*, 190 F.3d 9, 13 (2d Cir. 1999) (dictum); accord, "FTC Staff Commentary on the FDCPA," 53 Fed. Reg. 50,097, 50,108 (1988). This is a stretch, and not merely semantically; it makes the federal statute a vehicle for enforcing a state law, and why would Congress want to do that? But the plaintiffs have another string to their bow: the bad-debt buyers, they argue, misrepresented the legal status of their debts, in violation of another provision of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(2)(A), by representing that the interest rates they were charging were lawful when they were not.

Both theories depend on whether Illinois law prohibits the interest charges levied by the bad-debt buyers, and we can confine our analysis to that issue. Both district judges answered the question in the negative.

No appellate court has had occasion to decide whether section 5 of the Illinois Interest Act imposes the statutory interest ceilings on assignees of creditors who are authorized to charge interest rates higher than those ceilings. The plaintiffs argue that the only interest rates that nonexempt entities are authorized to charge are the stat-

utory rates, and these assignees—the bad-debt buyers— are nonexempt. Q.E.D. This is a semantically unexceptionable reading, but it produces a senseless result. If the credit card company hires a lawyer to collect a debt from one of its customers, the debt will until paid or abandoned accrue interest at the rate originally charged by the company. Why should the interest rate be lower if instead of collecting the debt directly the credit card company assigns (sells) the debt to another company, which hires the lawyer to collect it? The plaintiffs argue that the original creditor, because to be exempt from the statutory interest-rate ceilings it must be either licensed or a bank, is subject to regulatory controls designed (at least in the case of the licensed company, 38 Ill. Admin. Code § 160.220) to prevent it from engaging in abusive collection practices; the debt buyers are not subject to those controls. But their collection practices are regulated by the Fair Debt Collection Practices Act, on which this suit is founded; and if that is not enough, the state regulatory agency's control over the licensed creditors enables it to prevent them from evading controls over collection practices by assigning debts to unlicensed entities. See 205 ILCS 660/8.2, 13, 670/9, 22; *South 51 Development Corp. v. Vega*, 781 N.E.2d 528, 535-39 (Ill. App. 2002). Were there a regulatory gap, we would expect that agency to adopt the statutory interpretation for which the plaintiffs contend. It has never done so.

Adopting the plaintiffs' interpretation of the Illinois Interest Act would push the debt buyers out of the debt collection market and force the original creditors to do their own debt collection. Borrowers would not benefit on average, because creditors, being deprived of the assignment option as a practical matter (the statutory rates being far below the market interest rates for delinquent borrowers), would face higher costs of collection and would pass

much of the higher expense on to their customers in the form of even higher interest rates. It might be thought that assignees, since the debtors are not their customers, are more ruthless in collection than the original creditors, who might not wish to offend their customers, would be. But once a customer defaults, he is no longer a valued customer that the creditor is likely to want to coddle. And if the creditor does want to coddle his defaulting customers—maybe to reassure his other customers—he will either not assign the debt or assign it to a coddler.

There is an innocent reason that creditors assign collection to other firms rather than doing it themselves. It is the same reason that most manufacturers sell to consumers through independent distributors and dealers rather than doing their own distribution. Outsourcing phases of the total production process facilitates specialization, with resulting economies. Specialists in debt collection are likely to be better at it than specialists in creating credit card debt in the first place.

Because, as far as we can see, the only effect of interpreting section 5 to reach assignees would be to make the credit market operate less efficiently, we are reluctant to adopt the interpretation urged by the plaintiffs. The interpretation is not compelled. Since the phrase "or other laws of this State" was added to the Illinois statute in 1963—long after *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938), dispelled the notion that the common law enforced in a state's courts is not a state "law"—the phrase can be read to include the common law of assignments, whereby the assignee steps into the shoes of the assignor, assuming his rights as well as his duties. E.g., *Collins Co. v. Carboline Co.*, 532 N.E.2d 834, 839 (Ill. 1988); *John O. Schofield, Inc. v. Nikkel*, 731 N.E.2d 915, 925 (Ill. App. 2000). That was the law in Illinois in the 1960s, when the statute was amended, just as it is today. *Buck v.*

*Illinois Nat'l Bank & Trust Co.*, 223 N.E.2d 167, 169 (Ill. App. 1967). Not that the common law of assignment authorized assignees to charge interest as such. "[I]nterest was not allowed at common law, and its recovery depends entirely upon our statute." *Pieser v. Minkota Milling Co.*, 94 Ill. App. 595, 597 (1901). But once assignors were authorized to charge interest, the common law kicked in and gave the assignees the same right, because the common law puts the assignee in the assignor's shoes, whatever the shoe size.

Granted, it is a little odd to think of common law as "expressly authorizing" anything, since it is (compared to statutory law) unwritten law; the phrase "other laws" in section 5 of the Interest Act may have been intended to refer just to statutes that authorize the charging of interest, such as 205 ILCS 670/15(a); 735 ILCS 5/2-1303, 5/12-109; 625 ILCS 5/2-12(e), and 810 ILCS 5/4A-506. But a statute's primary reference need not exhaust its meaning, when the legislature has chosen a broad term. *R.G. Johnson Co. v. Marchiando*, 184 F.2d 377, 381 (7th Cir. 1950); *Carolin Corp. v. Miller*, 886 F.2d 693, 699 (4th Cir. 1989); *Aqua Bar & Lounge, Inc. v. United States*, 539 F.2d 935, 938 (3d Cir. 1976); cf. *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 396 (1951) (Jackson, J., concurring). Furthermore, while it is easy to see why consumer-protection concerns would lead a state to want to license firms that charge very high interest rates to consumers, assignees do not deal with consumers. It was the assignors who persuaded the plaintiffs to pay high interest rates; the plaintiffs could hardly have supposed that the rates would plummet if they defaulted!

And finally the fact that the agency entrusted with enforcing the licensing requirement has never adopted the plaintiffs' interpretation—*no one* until now had thought to advocate such an interpretation—is practical evidence

that the interpretation does not advance a legislative purpose.

So even if the plaintiffs have a decent technical argument for their preferred interpretation, its unreasonable consequences weigh heavily against it, even as a matter of interpretation, as the Illinois cases make clear, *In re D.F.*, 802 N.E.2d 800, 806 (Ill. 2003); *People v. Hanna*, 800 N.E.2d 1201, 1207-09 (Ill. 2003); see also *Krzalic v. Republic Title Co.*, 314 F.3d 875, 879-80 (7th Cir. 2002), and as even formalists concede. See references in *AM International, Inc. v. Graphic Management Associates, Inc.*, 44 F.3d 572, 577 (7th Cir. 1995). We conclude that section 5 of the Illinois Interest Act does not affect the common law rights of assignees, and the judgments of the district court in these two cases are therefore

AFFIRMED.

A true Copy:

      Teste:

                          _____

                          *Clerk of the United States Court of Appeals for the Seventh Circuit*